564 F.2d 126
 RESIDENT ADVISORY BOARD by Rose Wylie, Trustee ad litem,
Housing Task Force of the Philadelphia Urban Coalition by
Shirley Dennis and Joseph Miller, Trustees ad litem, Esther
Sierra Mendez, Individually and as guardian ad litem for her
children, Carmelo, Mariel and Juanita, Jean Thomas,
Individually and as guardian ad litem for her children,
Cheryl, James, Kevin and Byris Thomas, Mable Smith,
Individually and as guardian ad litem for her children,
Jerome, Vanessa and Janice Smith, and Bernice Devine,
Individually and on behalf of her children Robert, Linda and
Arthur Devine, on their own behalf and on behalf of all
persons on the waiting list for public housing in the City
of Philadelphia, Pennsylvania
v.
Frank RIZZO, Individually and in his capacity as Mayor of
Philadelphia, Hillel Levinson, Individually and in his
capacity as Managing Director of the City of Philadelphia,
Appellants in 77-1245, James H. J. Tate, Individually, Fred
T. Corleto, Individually, Multicon Construction Corp.,
Multicon Properties, Inc., Redevelopment Authority of the
City of Philadelphia, Defendants,
and
Whitman Area Improvement Council, Alice Moore, Fred Druding,
and all Members of Whitman Area Improvement Council and its
Officers, Agents, Servants, Representatives and Employees,
and all other persons Acting in concert with them or
otherwise participating in their aid, Defendant-Intervenors,
and
Philadelphia Housing Authority, Redevelopment Authority of
the City of Philadelphia, Russell Byers, Individually and as
Regional Administrator of the U. S. Department of Housing
and Urban Development, Carla A. Hills, Individually and as
Secretary of the United States Department of Housing and
Urban Development, and United States Department of Housing
and Urban Development, Third-Party Defendants.
Appeal of the PHILADELPHIA HOUSING AUTHORITY, in 77-1241.
Appeal of REDEVELOPMENT AUTHORITY OF the CITY OF
PHILADELPHIA, in 77-1242.
Appeal of WHITMAN AREA IMPROVEMENT COUNCIL, Fred Druding and
all others acting in concert therewith, in 77-1243.
 Nos. 77-1241 to 77-1243 and 77-1245.
 United States Court of Appeals,
Third Circuit.
 Argued June 6, 1977.
Decided Aug. 31, 1977.
 
 Harold Cramer, Marc S. Cornblatt, Arthur W. Lefco, Philadelphia, Pa., for appellant in 77-1241; Mesirov, Gelman, Jaffe & Cramer, Philadelphia, Pa., of counsel.
 Peter A. Galante, Nicholas J. Scafidi, Philadelphia, Pa., for appellant in 77-1242.
 Joseph M. Gindhart, Crumlish & Gindhart, Philadelphia, Pa., for appellants in 77-1243.
 James M. Penny, Jr., Julian Wessell, Asst. City Sols., Sheldon L. Albert, City Sol., Philadelphia, Pa., for appellants in 77-1245.
 Jonathan M. Stein, Harold R. Berk, George D. Gould, Community Legal Services, Philadelphia, Pa., Charles W. Bowser, Philadelphia, Pa., for appellees Resident Advisory Board et al.
 Drew S. Days, III, Asst. Atty. Gen., Brian K. Landsberg, Cynthia L. Attwood, Attys., Dept. of Justice, Washington, D. C., for U. S. as amicus curiae.
 David Belmont, Gwendolyn N. Bright, Philadelphia, Pa., for amicus curiae, the Housing Ass'n of Delaware Valley.
 Mercer D. Tate, John Ratliff, Philadelphia, Pa., for amicus curiae Fellowship Com'n.
 Martin E. Sloane, Arthur D. Wolf, Washington, D. C., for amicus curiae Nat. Committee Against Discrimination in Housing, Inc.
 Benjamin G. Lipman, Asst. Gen. Counsel, Sanford Kahn, Gen. Counsel, Pa. Human Relations Com'n, Philadelphia, Pa., for amicus curiae Pa. Human Relations Com'n.
 Before WEIS, Circuit Judge, CLARK,* Associate Justice and GARTH, Circuit Judge.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 Plaintiffs, various individuals eligible for low-income public housing in Philadelphia and organizations with a membership interested in such housing, seek relief in this civil rights action against the City of Philadelphia, the City's housing authority ("PHA"), and its redevelopment authority ("RDA"), and the Department of Housing and Urban Development ("HUD"). The dispute centers upon a plot of land in South Philadelphia which was condemned and cleared as a site for low-income public housing in 1959, and which has remained vacant since then. The district court found that the four governmental defendants had committed violations of various constitutional and statutory duties, 425 F.Supp. 987 (E.D.Pa.1976). The court ordered injunctive relief as follows: (1) the governmental defendants were ordered to "take all necessary steps" for the construction of the planned project; (2) PHA was ordered to formulate a plan for the racial composition of the project when built and tenanted; (3) PHA was ordered to formulate a plan to further the integration of all Philadelphia public housing projects; and (4) all parties[1] were enjoined from interfering with the construction of the project. All defendants except HUD have appealed.
 
 
 2
 We affirm the district court's finding that, in delaying and frustrating the construction of the project, the City of Philadelphia acted with discriminatory intent and thereby violated plaintiffs' constitutional and statutory rights. We also affirm the finding that PHA and RDA have violated Title VIII of the Civil Rights Act of 1968 in failing to carry out the construction of the project; however, we affirm not on the ground relied upon by the district court[2] (that the agencies were liable for not acting affirmatively to end racial discrimination as mandated by § 3608(d)(5) of the Act, 42 U.S.C. § 3608(d)(5)), but on the ground that their activities in clearing the site "(made) unavailable or (denied) a dwelling to . . . person(s) because of race" within the meaning of 42 U.S.C. § 3604(a).
 
 
 3
 We therefore affirm those sections of the district court order directing the construction and tenanting of the project at issue (parts (1) and (2)). We also affirm so much of part (4) of the order as enjoins interference with the project's construction by the governmental defendants, but we vacate so much of that paragraph which enjoins the Whitman Area Improvement Council ("WAIC"). Because we can find no basis for the far-reaching equitable relief granted against PHA with respect to all public housing in Philadelphia, we also vacate part (3) of the district court's order.
 
 I.
 A. Facts
 
 4
 The focal point of this dispute is the Whitman Urban Renewal Area ("Whitman") in South Philadelphia. Within the Whitman Urban Renewal Area is the site of the project (henceforth "Whitman project") which is at issue here. Like other neighborhoods in urban America, Whitman has undergone a transformation in its racial composition over the past several decades. Unlike most, however, Whitman has changed from an originally racially mixed area to one which is virtually all-white. Moreover, this change has resulted almost wholly from the urban renewal efforts of the defendant governmental agencies.
 
 
 5
 As revealed by the district court's analysis, Whitman's present all-white population must be viewed against a backdrop of, on the one hand, a growing concentration of blacks and other minorities in discrete, insular sections of Philadelphia (North Philadelphia, West Philadelphia and South Central Philadelphia), and on the other, a reduction in the number of blacks residing in other parts of the city, including Whitman. The net result has been, in the words of the district court, that "(t)he City of Philadelphia is today a racially segregated city." 425 F.Supp. at 1006.
 
 
 6
 This litigation involves not the city as a whole, however, but only the Whitman Urban Renewal Area for which the public housing at issue was planned. That area is a residential area consisting of block upon block of two-story row houses. Prior to the postwar concentration of blacks in the three sections of Philadelphia previously mentioned (North, West, and South Central Philadelphia), a substantial number of black residents could be found in Whitman's row houses. Still, a trend away from a dispersed black population throughout Philadelphia and, by inference, a trend away from an integrated Whitman was evident as early as 1940. That year's census revealed a decline of about 300 blacks from the population of Whitman. 425 F.Supp. at 1009. As late as 1950 though, a number of black households were to be found in the southeast and northwest corners of this area. Indeed, 75 black families lived in the southeast corner alone, Exhibit P-168. Of this number 52 families lived in a five-square-block area that would be leveled during 1959-60 in the initial phase of urban renewal in Whitman. As found by the district court, these 52 households constituted "46% of the families living (in this five-block area), which made this area an integrated section of Philadelphia." 425 F.Supp. at 1009.
 
 
 7
 Though integrated, Whitman was also somewhat dilapidated although subsequent developments were to show that the existing housing stock, i. e., the two-story row houses, could be salvaged through renovation. In the mid-1950's, however, renewal meant something other than renovation or restoration: renewal meant the razing of existing structures and the construction of "public housing" high-rise buildings. Thus when urban renewal came to Whitman in 1959-60, the integrated, five-block site mentioned above[3] was cleared of its residents, and its structures were leveled. The cleared site has remained virtually untouched, and without building construction, since that time.
 
 
 8
 Such, of course, was not the plan. The Philadelphia Housing Authority ("PHA") acquired the site through condemnation during 1959 and 1960, with the intention of constructing low-income public housing. After hearings PHA obtained necessary approvals both from the Philadelphia City Planning Commission and, in 1957, from the Department of Housing and Urban Development ("HUD").[4] On June 26, 1960, demolition contracts were awarded, and shortly thereafter the site was cleared.
 
 
 9
 The 1960 census tract reflects the impact of PHA's renewal efforts. With site clearance underway, only four black families were to be found within the five-block project site. 425 F.Supp. at 1009.[5] To quote the district court, PHA action "had the effect of removing some of the Black families who lived on the Whitman site." Id. at 995.
 
 
 10
 Thus by 1960 the ongoing clearance of the Whitman project site had worked substantial changes in the racial composition of the southeast section of Whitman, an area that had previously been integrated to the extent of having 46% black families. Condemnation and demolition had forced some black families to move out of Whitman, while others had relocated in the blocks adjacent to the project site (N.T. 31-147). By 1970, however, not one black family was to be found in the entire southeast corner of Whitman (Exhibit P-170). Indeed, the 1970 census revealed that only 100 blacks remained in the Whitman Urban Renewal Area as a whole (down from 200 in 1960 and from 400 in 1950 (N.T. 31-70)), and these families were concentrated in the northwest section of Whitman.
 
 
 11
 PHA's original plan for the Whitman site called for the development of a low-income project ("Delaware Towers"), which would consist of four high-rise apartment buildings. Because this plan, if implemented, would have required additional annexation of two small parcels of land, PHA held a public hearing on January 12, 1961. 425 F.Supp. at 987. Local opposition to high-rise, low-income housing on the Whitman site surfaced at this hearing, and, although the additional annexation was approved, community opposition to the construction of high-rise public housing on the Whitman site intensified. The high-rise opponents formed the Whitman Area Improvement Council to continue their fight. 425 F.Supp. at 995. Subsequently, Congress enacted the Housing Act of 1964, which included as § 1007 of that Act the so-called Barrett Amendment, which produced a change in the design of the Whitman project from high-rise towers to one- and two-family home construction. See 425 F.Supp. at 996. Thus, five years after condemnation and clearance of the Whitman project site by PHA, planning for the site had to begin anew.
 
 
 12
 The shift away from high-rise construction brought a new city agency into the planning process for the Whitman site the Redevelopment Authority of Philadelphia ("RDA"). RDA had earlier become involved in Whitman when, on October 27, 1963, it sought federal approval for the Whitman Urban Renewal Area. RDA's original plan involved razing an additional 103 homes in Whitman and rehabilitating 2500 more. This Whitman Urban Renewal plan did not itself affect the Whitman project site. Although the site was located within the Urban Renewal Area, it was designated as land to be used solely for public housing; indeed, the project site was the only area in Whitman which was designated for that purpose. 425 F.Supp. at 995. RDA's plan did not involve public housing per se, but rather involved assuring a substantial number of comfortable, attractive single-family residences in Whitman through the replacement or renovation of existing row-houses. The district court summarized RDA's efforts in Whitman as follows:
 
 
 13
 RDA, with federal funds from HUD and from other sources, condemned and acquired a total of 101 properties and parcels of land in the Whitman Urban Renewal Area at a total estimated cost of $1,550,075. Between 1969 and 1973, 109 new homes were privately developed and sold for between $25,000 and $30,000, all of which were eligible for FHA-insured mortgages. (N.T. 2-16). There was no opposition by WAIC to these privately developed homes. (N.T. 2-20). From January 1, 1966 until May 1, 1975, Whitman residents, through RDA and with the aid of federal funds, have obtained $2,718,278 in loans and grants to rehabilitate their homes. (N.T. 2-20). A total of 1,123 households have received funds from this program. Over one-fourth of all the households in the Whitman area have benefited from the grant and loan program initiated by RDA. (N.T. 2-21). Further, urban renewal activities in the area have included a wide range of activities benefiting the Whitman area. (N.T. 2-20).
 
 
 14
 425 F.Supp. at 996.
 
 
 15
 All of this RDA sponsored reconstruction in Whitman took place outside of the vacant Whitman project site. As described above by the district court, RDA condemned several blocks adjacent to the project site. Through the efforts of private developers, new townhouses were built on these sites. All of these houses were sold to and are occupied by white families.
 
 
 16
 It will be recalled that the clearance of the Whitman project site during 1959-60 had reduced the total number of black households in southeastern Whitman. Some of these families had relocated in areas adjacent to the cleared project site. RDA's condemnation of several of these blocks for construction during 1969-73 had the effect of again dislocating these families. The 1970 census revealed that the combined effect of PHA's and RDA's failure to provide any low-income housing on the vacant Whitman project site, and RDA's condemnation of several blocks adjacent to the project site resulted in an all-white area in southeastern Whitman.[6]
 
 
 17
 In sum, to repeat the conclusion of the district court, "(t)he effect of these urban clearance actions by both RDA and PHA appears to have converted an integrated area of Philadelphia into a non-integrated area." 425 F.Supp. at 1009.
 
 
 18
 Although the Whitman project site lay vacant throughout this period (1960-70), planning for the site continued. With the enactment of the Barrett Amendment and the abandonment of a high-rise design, a new plan for the site, involving both PHA and RDA, was developed. PHA sold the Whitman site to RDA for $1,217,679.59. 425 F.Supp. at 996. RDA in turn was to convey the site to a private developer, which would construct low-rise public housing upon it.
 
 
 19
 The need for a new plan that would be acceptable to WAIC led to the endorsement of the concept of a "turnkey" developer. As described by the district court:
 
 
 20
 A turnkey developer differed from a conventional housing developer in that the turnkey developer would purchase the land, hire the architect to design the project, produce the drawing, set a cost for his project and then submit his proposal to the Housing Authority. (N.T. 5-22). The Housing Authority, if it decided to accept a turnkey developer's proposal, would, after appropriate public hearings and approvals, sign a contract with the turnkey developer and HUD, which specified that the turnkey developer would build the project and upon completion turn it over to the Housing Authority for the agreed upon purchase price. The Housing Authority would manage the project and HUD would provide the necessary subsidies. (N.T. 5-22, 5-23).
 
 
 21
 425 F.Supp. at 996. HUD's involvement necessitated review by the agency's Equal Opportunity staff. As the Whitman project site could now be described as an integrated project planned for an all-white area, HUD approved the site for low-income, turnkey housing on June 4, 1968.[7]
 
 
 22
 PHA and RDA solicited turnkey developers for the project during the latter part of 1969. From the 12 developers who responded, PHA chose Multicon Construction Corp. and Multicon Properties, Inc. ("Multicon") to build the Whitman project. PHA's choice of Multicon was approved by HUD on May 20, 1970. RDA and Multicon entered into a contract on July 14, 1970 under which Multicon might obtain the project site and build the project. The Philadelphia City Council and then-Mayor Tate enacted an ordinance approving Multicon; an agreement of sale was executed by PHA and Multicon; and, on October 30, 1970, RDA conveyed title of the site to Multicon.
 
 
 23
 Multicon's design called for the building of 120 townhouses on the Whitman site. Unlike most public housing to that point in time, each unit was to be a discrete structure on its own plot of land much closer in conception to the detached, single-family home characteristic of suburban developments than to the typical multi-family structures characteristic of low-income public housing. Indeed, one reason why Multicon's plan was selected was its compatibility with the surrounding neighborhood: the plan "maintained existing street patterns and the housing was of the same design as the other houses in the Whitman area." 425 F.Supp. at 997. This design also met the requirements for a newly promulgated federal program, "Turnkey III", under which the tenants of a project could eventually own their homes by paying rent, assuming maintenance responsibilities and residing in the project for a designated time.[8]
 
 
 24
 Approval of an urban renewal project necessitated consultation with local community representatives. WAIC was designated the "local citizen participation unit" for the Whitman Urban Renewal Area. The district court described a process of extended consultation with and participation by WAIC during the course of the approval process. 425 F.Supp. at 997. WAIC's suggestions produced modifications in Multicon's plan, and the result, by June 2, 1970, was a meeting at which the Turnkey III proposal was fully explained. The minutes of the June 2d meeting reported a consensus: "It was agreed the proposed plans look excellent." (N.T. 2-26). WAIC's endorsement of the planned townhouses is revealed in a letter dated June 9, 1970, from the then-President of WAIC to Multicon, the developer:
 
 
 25
 We were very impressed with the plans and feel that the design of these houses will make them an asset to our community.
 
 
 26
 (N.T. 2-26).[9]
 
 
 27
 A ground-breaking ceremony for the Whitman Park Townhouse Project was held on December 16, 1970. Between the ground-breaking and the scheduled start of construction in late March 1971, however, WAIC's attitude toward the Townhouse Project shifted and hardened. By January 28, 1971, the President of WAIC was expressing doubts about the project; by March 22, 1971, WAIC had elected a new President and had decided to oppose the project specifically, "to demonstrate the next morning" when construction was finally to begin. (N.T. 2-33). The stipulated facts revealed the following sequence of events when Multicon sought to commence construction of its townhouses on March 23rd:
 
 
 28
 Beginning on or about 7:30 A.M. on March 23, 1971 approximately thirty women, some of whom were WAIC members, entered on the site of the Whitman Park Townhouse Project and gathered around the bulldozer and backhoe, blocking the operations of the contractor, refusing to leave the property when so requested and preventing the operations of these pieces of equipment. Fred Druding, the new WAIC President, was also present in the morning. . . .
 
 
 29
 On or about 9:05 A.M. on March 23, 1971 demonstrators, including WAIC members, blocked a truck on Shunk Street from the Atlas Lumber and Millwork Company, which was attempting to make a delivery to MPI at the Whitman Park Townhouse Project, and as a result the truck driver was unable to enter the property to make the delivery. P-61 is incorporated herein.
 
 
 30
 On or about eight o'clock on March 25, 1971 (former WAIC President) Mrs. Alice Moore and other demonstrators, including members of WAIC, gathered around the bulldozer of Louis Dolente and Sons, parked on the northeast corner of Hancock and Shunk Streets, thereby preventing its operation.
 
 
 31
 (N.T. 2-33 to 34) (paragraph numbering omitted).
 
 
 32
 Unable to begin work, Multicon sought to enjoin further demonstrations in the Philadelphia County Court of Common Pleas. Although Multicon obtained a preliminary injunction, its attempts to return to work were to no avail, as demonstrators continued to block deliveries from Multicon's contractors and to bar all access to the project site. Multicon's request to the Philadelphia police to enforce the state court injunction was rebuffed.[10] Eventually, on April 30, 1971, the Pennsylvania state court judge decided to bar Multicon from attempting to return to work while the parties negotiated a settlement. 425 F.Supp. at 998.
 
 
 33
 The district court summarized the ensuing negotiations between the parties as follows:
 
 
 34
 Shortly thereafter, there were a series of meetings between WAIC, PHA and Multicon. (N.T. 2-78, 3-41, 3-42, 10-39). Various changes in the Whitman Park Townhouse Project were proposed to WAIC in order to settle the controversy, including opening a building in the project as a community recreation area, reserving 50% of the units for persons who were displaced by the clearance for the Whitman project, raising the income levels of those persons who would be eligible for the project and setting up a screening committee, which would include Whitman residents, to assure that those living in the project would be an asset to the community. (N.T. 3-45, 10-43, 10-44, 10-45, 10-46, 10-47). On May 17, 1971, after full discussion and consideration of the settlement proposals, WAIC voted down the final settlement offer of PHA. (N.T. 2-89, 3-45, 3-46). On May 18, 1971, Mayor Rizzo was nominated as the Democratic candidate for Mayor. (N.T. 3-53). On May 20, 1971, a meeting was held in Judge Hirsch's chambers to consider a request by Multicon that the court's order of April 30, 1971 be lifted and that Multicon be permitted to return to work on the Whitman Park Townhouse Project. (N.T. 3-55, 3-56, 19-21, 19-24, 19-25). At the May 20th meeting, Managing Director Corleto stated that the City would not provide police assistance for Multicon should it return to work. (N.T. 3-57, 19-26 to 19-28). Mr. Gordon Cavanaugh, Chairman of PHA, stated to those present at the meeting that he had been instructed by Mayor Tate to order Multicon not to resume work. (N.T. 2-91, 3-59, 19-26, 19-34, 19-36). Judge Hirsch then signed an order permitting Multicon to return to work. However, faced with a threatened lack of police assistance, Multicon decided that it would not then return to work. (N.T. 19-38). On June 3, 1971, Multicon approached HUD in Washington, D.C. and sought assistance from HUD in building the Whitman Park Townhouse Project. (N.T. 3-69, 10-73). Multicon requested HUD to exert whatever pressure it could upon the City to get the City to cooperate in building Whitman. (N.T. 3-69, 10-73). However, a HUD official in Washington, D.C. stated that HUD did not want to take any action until after the November, 1971 election in Philadelphia. (N.T. 10-74 to 10-76).
 
 
 35
 425 F.Supp. at 998-99. (Footnote omitted).
 
 
 36
 At this juncture, on June 25, 1971, plaintiffs filed the complaint in the instant action in the United States District Court for the Eastern District of Pennsylvania. However, in view of the pending state court proceedings involving the various defendants and the possibility that those proceedings might provide a resolution of the dispute over the Whitman project, the federal court action was stayed. Later, with the realization that such a final resolution would not be forthcoming in the state courts, see 425 F.Supp. at 992-93, the parties went through drawn-out, constantly contested discovery proceedings which continued until the eve of trial on October 7, 1975.
 
 
 37
 During these 4 1/2 years of pretrial maneuvering in the federal district court, Whitman remained a site of controversy rather than a site of construction. On July 18, 1971, the same day that Multicon finally obtained a permanent injunction against WAIC's interference with Multicon's construction efforts at the Whitman site,[11] WAIC filed its own lawsuit, WAIC v. Multicon, No. 1187 (July Term 1971, C.P. Phila.), in an attempt to prevent that construction. This action was to continue until March 20, 1974, when it was finally dismissed as moot.
 
 
 38
 1971 was an election year in Philadelphia. During the mayoral campaign, the present Mayor, Frank Rizzo, "publicly took the position that within the framework of the law, he would support local communities in their opposition to public housing projects proposed for their neighborhoods. (N.T. 42-75, 42-77)." 425 F.Supp. at 1001.[12] While campaigning, Mayor Rizzo strongly supported WAIC's resistance to the Whitman project.[13]
 
 
 39
 Once elected, the opposition of Mayor Rizzo and his City Administration to the Whitman project did not abate.[14] Indeed, Mayor Rizzo told James Greenlee, the chairman of PHA, that he meant to honor his campaign promise to Whitman residents that the Townhouse project would not be built. 425 F.Supp. at 1002. The Mayor urged Greenlee to investigate the possibility of cancelling the project. Mayor Rizzo was informed that cancellation of the Townhouse project would jeopardize federal funding for the entire city, especially in light of the project's HUD-necessitated pairing with the already constructed Morton Addition Project in a racially impacted area of Philadelphia. See note 7 supra. In view of these possible consequences, Greenlee suggested that an attempt at compromise should be made. Mayor Rizzo rejected any compromise where "people in the area felt that Black people would be moving into the area if public housing were built." 425 F.Supp. at 1002.
 
 
 40
 Faced with Mayor Rizzo's unequivocal disavowal of PHA's obligation to build the Whitman Townhouse project, Greenlee described to Rizzo the procedure for cancellation of public housing projects set out in the so-called "Phillips Amendment," Pub.L. No. 83-176, 67 Stat. 298, 306. In addition to requiring that the City repay any federal monies advanced and settle all claims by the builder, the Phillips Amendment would require a public hearing before the Philadelphia City Council. Mayor Rizzo indicated that the City's termination costs would be no obstacle; however, the public hearing requirement was anathema to him because the procedure "would bring Black people to City Hall to protest the proposed cancellation." 425 F.Supp. at 1002.
 
 
 41
 The City's subsequent opposition to the Whitman project took many forms. These were detailed in part by the district court when it described some of the difficulties encountered by Multicon. 425 F.Supp. at 999-1001. In addition, Multicon, the project developer, was told by Deputy Mayor Philip Carroll "that the City did not want the Whitman project built." Id. at 1002.
 
 
 42
 Multicon turned to HUD for assistance in clearing the City's impediments to construction, 425 F.Supp. at 1002, asking that HUD consider use of its power to cut off all federal funding to the City to force the construction of the project. HUD rejected this suggestion "for political reasons." Id. at 1002-03 n.28.
 
 
 43
 Meanwhile, RDA set the stage for a possible termination of the construction contract. The district court opinion notes that RDA passed a resolution on April 28, 1972, authorizing its general counsel to act in the event PHA certified that Multicon was in default on the contract. Id. at 1003. Multicon thus found itself between a rock and a hard place. On the one hand, it was bound by its contract with PHA to complete construction by April 29, 1972, and was therefore potentially liable for breach of contract if it failed to complete the project. On the other hand, the combined opposition of WAIC and the City prevented construction from going forward. Choosing the alternative of once again attempting to resume construction, Multicon gave notice to the City that such construction would begin on June 26, 1972.
 
 
 44
 Multicon's optimism was not fulfilled. State-court litigation ensued. The district court's opinion traces these state court proceedings and we will not burden this opinion with a recitation of those events. Suffice it to say that this litigation did not result in a resumption of construction of the Whitman project. See 425 F.Supp. at 1003-06. As of the present time, the site is vacant, with no construction apparently contemplated. Still, HUD holds an appropriation of $3.68 million for the construction of the Whitman Townhouse project as planned. 425 F.Supp. at 1006.
 
 B. Procedural History
 
 45
 This case, as noted above, first came before the district court in 1971. Because of the parties' hope that ongoing state court litigation would produce a settlement resolving their dispute, and because of the complexity of pretrial discovery once that hope was proved futile, trial in the Eastern District of Pennsylvania did not begin until October 7, 1975. The case was tried without a jury over a span of 57 days.
 
 
 46
 Plaintiffs brought the suit as a class action, claiming to represent
 
 
 47
 all low income minority persons residing in the City of Philadelphia who, by virtue of their race, are unable to secure decent, safe and sanitary housing, outside of areas of minority concentration, and who would be eligible to reside in the Whitman Park Townhouse Project.
 
 
 48
 425 F.Supp. at 993. The district court certified the suit as a class action on behalf of this class on May 8, 1975. Several individual members of the class were also named as plaintiffs, although only one of these testified at trial.
 
 
 49
 Two organizational plaintiffs are also parties. The Resident Advisory Board ("RAB") has at least a nominal membership of "all those currently living in public housing in the City of Philadelphia," 425 F.Supp. at 993, and, pursuant to an agreement with PHA, it routinely represents public housing tenants' interests in matters concerning PHA, HUD or the tenants themselves. The other organizational plaintiff, the Housing Task Force of the Urban Coalition, is described as a division of the Urban Coalition "concerned mainly with improving housing conditions for lower income people . . . (and) with the availability of public housing for those low income groups." Id. at 994.
 
 
 50
 Originally, the defendants were the Mayor of Philadelphia in 1971, James H. J. Tate, the City Managing Director Fred Corleto, and the two Multicon corporations. WAIC was permitted to intervene as a defendant, and PHA, RDA and HUD were added, first as third party defendants (by WAIC) and eventually as defendants (by plaintiffs). The change in City administrations in 1972 resulted in joinder of Mayor Rizzo and the City's new Managing Director, Hillel Levinson, as individual defendants. The new Mayor and Managing Director were substituted in their official capacities as well. Finally, the Philadelphia City Council was added to the roll of defendants to protect against the contingency of the district court's ordering relief that could only be afforded by City Council action.
 
 
 51
 The 57-day trial produced a voluminous record, which included several hundred exhibits and testimony from experts for both sides as well as from various public officials. At the conclusion of the trial, the district court determined that plaintiffs were entitled to equitable relief and on November 5, 1976, entered the following order:
 
 
 52
 (I)t is hereby ORDERED as follows:
 
 
 53
 (1) The defendants Philadelphia Housing Authority, Redevelopment Authority for the City of Philadelphia, City of Philadelphia, Department of Housing and Urban Development, their officers, agents, and employees shall immediately take all necessary steps for the construction of the Whitman Park Townhouse Project as planned.
 
 
 54
 (2) PHA shall submit to this Court within ninety days a plan for the racial composition of the Whitman Park Townhouse Project.
 
 
 55
 (3) PHA shall present to this Court within ninety days a plan concerning the tenanting of all public housing projects within the City of Philadelphia which will further racial integration.
 
 
 56
 (4) All parties to this litigation are enjoined from taking any action which will interfere in any manner with the construction of the Whitman Park Townhouse Project.
 
 
 57
 425 F.Supp. at 1029.
 
 
 58
 Defendants PHA, RDA, WAIC and the City have appealed.
 
 
 59
 While the district court has yet to render final judgment within the meaning of 28 U.S.C. § 1291,[15] nevertheless this Court has jurisdiction to review the four-part injunctive Order of November 5, 1976, see 28 U.S.C. § 1292(a)(1), despite the fact that in part the district court order contemplates no more than the submission of plans by PHA. Frederick L. v. Thomas, 557 F.2d 373, 378-81 (3d Cir. 1977).
 
 II.
 
 60
 At the outset we observe that the Supreme Court's recent decision in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), resolves any doubt that the district court correctly reached the merits of this dispute. Based upon the Arlington Heights discussion of standing and its discussion of Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) it is clear that both the institutional and individual plaintiffs here have " 'alleged such a personal stake in the outcome of the controversy' as to warrant (their) invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on (their) behalf."[16]
 
 
 61
 Specifically, the Arlington Heights Court looked to the injury suffered by a potential tenant of the specific project which had not yet been approved for construction because of Arlington Heights' refusal to rezone. That "tenant's" complaint, far from being a mere "generalized grievance," "focus(ed) on a particular project and (was) not dependent on speculation about the possible actions of third parties not before the court." 429 U.S. at 264, 97 S.Ct. at 563. Thus the Supreme Court concluded that the Arlington Heights plaintiffs had standing to assert their claims, and the Court proceeded to reach the merits of the controversy.
 
 
 62
 Here, the named individual plaintiffs assert the same type of allegation that sufficed to afford standing in Arlington Heights. Their grievance, like that of the potential "tenant" in Arlington Heights, focuses on the failure by responsible public officials to take the steps necessary to construct a specific project (the Whitman Townhouse project). As in Arlington Heights, granting the relief that the plaintiffs here seek will produce "at least a 'substantial probability' that the (Whitman) project will materialize, affording (plaintiffs) the housing opportunities (they) desire." Id. (citation omitted).
 
 
 63
 As the district court's discussion reveals, 425 F.Supp. at 1011-12, two separate individuals Jean Thomas (a present public housing tenant) and Nellie Reynolds (the head of RAB and a present public housing tenant) testified that each would suffer a particularized injury if the Whitman project is not constructed. In addition a substantial portion of the membership of RAB would also be eligible to live in the Whitman project if completed. Thus RAB, with a number of members who could individually aver an "actionable causal relationship" between the failure to construct the Whitman project and his or her own injury, has standing to raise the claims asserted by plaintiffs. Compare United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (standing found where injury to individual members was shown) with Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (no standing in absence of showing of particularized injury to members).
 
 We therefore proceed to the merits.[17]
 III.
 A. HUD
 
 64
 Section 3608(d)(5) of Title 42, United States Code, directs the Secretary of Housing and Urban Development to:
 
 
 65
 administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter.
 
 
 66
 HUD, obviously recognizing its affirmative duty (to exercise its best efforts to have the project constructed), has not appealed from the district court's Order of November 5, 1976.[18]
 
 B. The City
 
 67
 The district court based its issuance of injunctive relief against the City of Philadelphia on three separate grounds. First, the City was found liable for failing to undertake affirmative action "implementing the national policy of fair housing,"[19] i. e., failing to discharge duties imposed by42 U.S.C. § 3608(d)(5). See 425 F.Supp. at 1018-19. Second, the court found the City liable under an unspecified section of Title VIII because the City's actions with respect to the Townhouse project had "a disparate racial effect"[20] and thus established a Title VIII prima facie case not overcome by any "compelling governmental interest." See id. at 1021-24. Finally, the court found that the City had violated the Civil Rights Act of 1866 (42 U.S.C. §§ 1981 & 1982) and the Thirteenth and Fourteenth Amendments because the actions of the City had a racially discriminatory impact and were taken with a discriminatory purpose or motivation. 425 F.Supp. at 1024, 1025. We conclude, as did the district court, that the City violated § 1981 and § 1982 by depriving plaintiffs of constitutional rights guaranteed by the Thirteenth and Fourteenth Amendments.[21]
 
 
 68
 Current Supreme Court decisions mandate that to establish that a governmental defendant has abridged constitutional guaranties, something more than a disproportionate discriminatory impact must be proved. This "impact-plus" test is satisfied only if, in addition to disproportionate impact, a discriminatory purpose is shown. Washington v. Davis, 426 U.S. 229, 239-45, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); see also Dayton Board of Education v. Brinkman, --- U.S. ----, ----, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (test is "whether there was any action (by government defendants) which was intended to, and did in fact, discriminate"); Village of Arlington Heights v. Metropolitan Housing Development Corp., supra, 429 U.S. at 265, 97 S.Ct. at 563 ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause").
 
 
 69
 Where civil rights plaintiffs claim that discrimination in housing has worked a deprivation of equal protection, the starting point for analysis is the Supreme Court's recent decision in Arlington Heights, supra. In that case, the Village of Arlington Heights was requested to rezone a tract of land to permit construction of racially integrated low and moderate income housing. At public hearings, the Village's Plan Commission heard opponents denounce the proposed change for a variety of reasons the undesirability of introducing racially integrated housing to Arlington Heights (which at that time had a population that was 99.9% white); the unfairness of the change to adjacent landowners who had purchased their property in reliance upon single-family zoning; and the incompatibility of permitting multi-family construction in the middle of a single-family residential neighborhood when all other multi-family tracts (and there were such tracts) had theretofore been zoned and located to act as "buffers" between single family neighborhoods and industrial or commercial districts. See 429 U.S. at 256, 97 S.Ct. 555. The Plan Commission, and the Village, denied the requested zoning change. A subsequent civil rights action by the developers who had proposed the project (and by individuals who would be eligible to live in the project) resulted in judgment for the Village in the district court. The Court of Appeals for the Seventh Circuit reversed, 517 F.2d 409 (7th Cir. 1975), although the court left undisturbed the district court's finding that Arlington Heights' denial of the requested change was not racially motivated. The Court of Appeals' holding rested upon the assumption that a showing of a racially disproportionate impact would suffice to invalidate governmental action, absent demonstration of a compelling interest.
 
 
 70
 The Supreme Court's opinion in Washington v. Davis, supra, negated this assumption. On certiorari in Arlington Heights, the Supreme Court reversed the Seventh Circuit's decision, citing the absence of proof of racially discriminatory intent. 429 U.S. at 268, 97 S.Ct. 555. The Court, in discussing the application of the Washington v. Davis standard in a "housing" case, said:
 
 
 71
 Davis does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.
 
 
 72
 Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it "bears more heavily on one race than another," Washington v. Davis, 426 U.S., at 242, 96 S.Ct. 2040 may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. Yick Wo v. Hopkins, 118 U.S. 356, (6 S.Ct. 1064, 30 L.Ed. 220) (1886); Guinn v. United States, 238 U.S. 347, (35 S.Ct. 926, 59 L.Ed. 1340) (1915); Lane v. Wilson, 307 U.S. 268, (59 S.Ct. 872, 83 L.Ed. 1281) (1939); Gomillion v. Lightfoot, 364 U.S. 339, (81 S.Ct. 125, 5 L.Ed.2d 110) (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in Gomillion or Yick Wo, impact alone is not determinative, and the Court must look to other evidence.
 
 
 73
 The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. See Lane v. Wilson, supra; Griffin v. County School Board, 377 U.S. 218, (84 S.Ct. 1226, 12 L.Ed.2d 256) (1964); Davis v. Schnell, 81 F.Supp. 872 (S.D. Ala.), aff'd per curiam, 336 U.S. 933, (69 S.Ct. 749, 93 L.Ed. 1093) (1949); cf. Keyes v. School District No. 1, 413 U.S. (189), at 207, (93 S.Ct. 2686, 37 L.Ed.2d 548). The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. Reitman v. Mulkey, 387 U.S. 369, 373-376, (87 S.Ct. 1627, 18 L.Ed.2d 830) (1967); Grosjean v. American Press, 297 U.S. 233, 250, (56 S.Ct. 444, 80 L.Ed. 660) (1936). For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.
 
 
 74
 429 U.S. at 265, 97 S.Ct. at 563 (footnotes omitted). With this instruction in mind, the Arlington Heights Court upheld the district court's finding that discriminatory purpose was not a motivating factor in the Village's decision.
 
 
 75
 We note that in the instant case the district court judge gave full effect to the teachings of Washington v. Davis, even though the decision below was rendered before Arlington Heights was decided. See 425 F.Supp. at 1024-25. For example, before considering the City's alleged breach of plaintiffs' right to equal protection, the district court's opinion analyzed the source and nature of the opposition of WAIC to the Whitman Townhouse project. The court concluded that although the record revealed evidence of racial bias by individual WAIC members, that evidence was insufficient to warrant a finding of racially discriminatory intent. Id. at 1024. Thus no constitutional (Thirteenth Amendment) violation by WAIC was found.
 
 
 76
 Turning to the City, however, a different picture emerges. The district court held that the City had acted with racially discriminatory intent, as evidenced by: (1) the City's joining in opposition to the Whitman Townhouse project with knowledge that some of that opposition was racially motivated; (2) Mayor Rizzo's explicit statements equating "public housing" with "Black housing" and his public stand "against placing such housing in White neighborhoods"; and (3) the City's taking steps to terminate the project with knowledge that the action would produce a racially discriminatory effect. 425 F.Supp. at 1025.
 
 
 77
 As for the actual consequences of the failure to construct the Whitman Townhouse project, the district court found the following effects of termination:
 
 
 78
 The cancellation of the Whitman Park Townhouse Project had a racially disproportionate effect, adverse to Blacks and other minorities in Philadelphia. The waiting list for low-income public housing in Philadelphia is composed primarily of racial minorities. Of the 14,000 to 15,000 people on the waiting list for public housing in Philadelphia (N.T. 56-84), 85% are Black, and 95% are considered to be of racial minority background. (N.T. 40-103). Obviously those in housing projects, which are overwhelmingly Black, and those on the public housing waiting list, are those least able to move out of the poorer, racially impacted areas of Philadelphia. The evidence also established that Blacks in Philadelphia who are concentrated in the three major Black areas of Philadelphia, have the lowest median income in comparison with the total population of Philadelphia and live in the poorest housing in Philadelphia. The Whitman Park Townhouse Project was a unique opportunity for these Blacks living in racially impacted areas of Philadelphia to live in an integrated, non-racially impacted neighborhood in furtherance of the national policy enunciated in Title VIII of the Civil Rights Act of 1968. Public housing offers the only opportunity for these people, the lowest income Black households, to live outside of Black residential areas of Philadelphia. Cancellation of the project erased that opportunity and contributed to the maintenance of segregated housing in Philadelphia.
 
 
 79
 425 F.Supp. at 1018. This discriminatory effect and the invidious discriminatory purpose underlying the City's role in the project's termination together were found to establish a constitutional violation under Washington v. Davis.
 
 
 80
 Applying the Supreme Court's Arlington Heights elaboration of the "impact-plus" test of Washington v. Davis, the district court's conclusions are, if anything, reinforced. Under the applicable Arlington Heights criteria, "invidious discriminatory purpose" can be gleaned through an inquiry which weighs a number of factors:
 
 
 81
 (1) discriminatory impact;
 
 
 82
 (2) the historical background of the attacked decision;
 
 
 83
 (3) the "sequence of events leading up to the challenged decisions";
 
 
 84
 (4) departures from "normal procedural sequences"; and
 
 
 85
 (5) departures from normal substantive criteria.
 
 
 86
 Arlington Heights, supra, 429 U.S. at 265, 97 S.Ct. 555. See pages 141-142 supra.[22]
 
 
 87
 Here, the discriminatory impact of the City's obstruction of the project could hardly be clearer. As the district court's findings reveal, the Whitman Townhouse project, when built and tenanted, would restore a measure of racial integration to a now-all-white portion of Whitman, thus providing an opportunity for at least some of those currently on the PHA's public housing waiting list 95% of whom are nonwhite to live in an integrated, non-racially impacted environment. The City's opposition to the construction of the project had the undeniable effect of "bear(ing) more heavily on one race than another," Arlington Heights, supra, 429 U.S. at 266, 97 S.Ct. at 564, quoting Washington v. Davis, supra, 426 U.S. at 242, 96 S.Ct. 2040.
 
 
 88
 But discriminatory effect, standing alone, will only infrequently suffice to establish an equal protection violation.[23] When further inquiry into purpose is necessary as is the case here the remaining factors noted by the Arlington Heights Court come into play.
 
 
 89
 The second "evidentiary source" to be considered, 429 U.S. at 264, 97 S.Ct. 555, is the historical background of the allegedly discriminatory decision. Here, the historical backdrop to the City's obstruction of the Whitman project, i. e., the events occurring prior to the current City Administration's assumption of power in 1972, is easily summarized. The City's housing authority, PHA, administered a public housing system that was de jure segregated through the 1940's. Nonetheless, it was PHA that proposed the original high-rise project in Whitman and cleared the site for construction. The City's role appeared to be a purely passive one at that point. When the current low-rise design was adopted, the City Council and then-Mayor Tate enacted an ordinance approving Multicon as the developer. These acts were taken before WAIC reversed its earlier endorsement of the project and began its campaign of active opposition.
 
 
 90
 It was at that point that the City's passive role ended. The City's frustration of Multicon's efforts to enclose the construction site (see 425 F.Supp. at 999-1001) a security measure which, if effected, undoubtedly would have permitted construction to proceed gives evidence of the City's joining in community opposition. The repeated refusals by the Philadelphia police to protect Multicon's construction activities buttress this conclusion, as does then-Mayor Tate's decision to order Multicon to halt construction. While this background provides no direct evidence of discriminatory purpose on the City's part, the circumstances of a sudden shift in the City's position from passive acceptance to active opposition, in the face of protests by demonstrators manifesting racial bias,[24] provides some indication of an improper motive or purpose.
 
 
 91
 The third factor specified in Arlington Heights, see p. 143 supra, is the specific sequence of events leading to the challenged decision: here, the record of the Rizzo administration's opposition to the Whitman project. During his election campaign, Mayor Rizzo repeatedly voiced objections to the Whitman project, indicating that he would preserve the City's neighborhoods at any expense, and that he would support any community seeking to prevent construction of a housing project. See pp. 136-137 supra. In the course of exploring the possible means of preventing the project's construction, Mayor Rizzo equated public housing with "Black housing" (because most public housing tenants are black), and stated that public housing should not be placed in white neighborhoods. 425 F.Supp. at 1001. Similarly, when Mayor Rizzo was told of the Phillips Amendment's fairly rigorous requirements for cancelling a public housing project, he indicated that while the expense of cancellation would not be a barrier, the requirement that a public hearing be held made the procedure unpalatable because such a hearing would bring blacks to City Hall. 425 F.Supp. at 1002.
 
 
 92
 The district court's opinion also records numerous instances of departures from normal procedural sequences (the fourth Arlington Heights factor). The dispute over Multicon's proposed fence provides but one example. City officials gave contradictory instructions, waiving permit and licensing requirements at one moment and insisting on strict compliance the next. Multicon was required to satisfy regulations involving street access and sidewalk maintenance not enforced elsewhere. The most striking example of procedural irregularity, however, is the City's involvement in the attempted termination of the project. It was made clear to City officials that the Phillips Amendment set forth the normal procedure for terminating a project. However, because that procedure necessitated a public airing of the City's reasons for cancellation, the Phillips Amendment was bypassed. Instead, the City insisted that Multicon, the developer, was in default, and that default by Multicon required termination of the project. The procedure adopted would seem to be especially significant where the "normal" procedure not employed would have required the City to reveal its reasons for making its decision at public hearings.
 
 
 93
 A glaring "substantive" departure from normal decision-making (the fifth Arlington Heights factor) was the City's decision to abandon a housing project which, pursuant to agreement with HUD, had been "matched" with another, already-built project. Normally, we would suspect that breaching an agreement with HUD, with the attendant risk of termination of all HUD aid, would be an unacceptable price for a City administration to pay for the cancellation of a housing project. Such was not the case here: apparently, the price, if not right, was affordable, and no regard was given to the fact that the "matched" project (the Morton Addition, see note 7 supra ) had already been built.
 
 
 94
 Where, as here, the applicable Arlington Heights "evidentiary sources" for a gleaning of official intent all point to unusual, aberrant circumstances surrounding the City's action, which reveal direct and circumstantial proof of racial bias, we will not disturb the district court's finding that the City of Philadelphia was racially motivated in its opposition to the Whitman project.
 
 
 95
 Indeed, the Arlington Heights Court all but anticipated this very case when it observed that a change in zoning laws preventing construction in the face of the announcement of a plan to erect integrated housing would present "a far different case" than Arlington Heights. The record here reveals this to be, by analogy, that "far different" case. The City of Philadelphia changed its stance from passive support for the Whitman project to active opposition only after the initiation of bias-tinged local demonstrations. In terminating the Whitman project, the City violated the plaintiffs' right to equal protection. See also Cooper v. Aaron, 358 U.S. 1, 8, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (school board previously going forward with preparation of desegregation plans held to have denied equal protection when in face of community and state governmental protests, it abandoned plans).
 
 
 96
 To remedy Philadelphia's violation of plaintiffs' constitutional rights, the district court ordered that the City take "all necessary steps for the construction of" and enjoined the City from interfering with, the Whitman project. 425 F.Supp. at 1029. We recognize that once a violation is found, "(t)he task is to correct, by balancing of the individual and collective interests, the condition that offends the Constitution." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Notwithstanding the Supreme Court's observation in Swann that "the scope of a district court's equitable powers to remedy past wrongs is broad", id. at 15, 91 S.Ct. at 1276, the Supreme Court has in recent equal protection cases given careful scrutiny to the choice of remedy to assure that the relief granted is no broader than that necessary to remove the violation and its effects. E. g., Dayton Board of Education v. Brinkman, --- U.S. ----, ---- - ----, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). See also Rizzo v. Goode, 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). "Once a constitutional violation is found, a federal court is required to tailor 'the scope of the remedy' to fit 'the nature of the violation,' " Brinkman, supra, --- U.S. at ----, 97 S.Ct. (2766) at 2775.[25] In short, the federal equitable remedy must cure the constitutional defect but the dosage must not exceed that necessary to effect the cure.
 
 
 97
 Here, the injunctive relief decreed by the district court is directly responsive to and seeks to "cure" the violation proved, which arose with the City's resistance to, and obstruction of, the Whitman Townhouse project.
 
 
 98
 As earlier indicated, see note 21 supra, having concluded that the district court did not err in its holding that the City had violated the plaintiffs' constitutional rights, we have no need to address the statutory arguments asserted by the plaintiffs and discussed by the district court.
 
 C. PHA and RDA
 
 99
 Having determined that the district court's grant of injunctive relief against the City must be affirmed, we next consider the district court's order as it pertains to the municipal agencies PHA and RDA. As opposed to the finding of intent and discrimination which the district court made with respect to the City, neither of these agencies was found by the district court to have violated the constitutional rights of the plaintiff class. Both, however, were held liable under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 et seq. Because we conclude that the district court's findings demonstrate that both PHA and RDA committed breaches of 42 U.S.C. § 3604(a) by "making unavailable" or denying (Whitman) housing to members of the plaintiff class, we affirm as to these defendants §§ (1), (2) and (4) of the district court's order which grant injunctive relief to the plaintiffs.
 
 1.
 
 100
 The district court based its holding of Title VIII liability against PHA and RDA upon a finding that the actions of the two agencies in Whitman resulted in a discriminatory effect, 425 F.Supp. at 1021-24, and upon the conclusion that, in producing that effect, the agencies necessarily breached the "affirmative" duty to further integration, a duty imposed by Title VIII's § 3608(d)(5), 425 F.Supp. at 1013-21. Because we conclude that the showing of discriminatory effect established by the record violated 42 U.S.C. § 3604(a), we decline the invitation to review the finding of a breach of affirmative duty, and we leave for another day the question whether section 3608(d)(5)'s requirement that the Secretary of HUD act "affirmatively" to foster integration[26] applies to local governmental entities as well[27] and, if so, whether that duty is judicially enforceable.[28] What we do decide is that plaintiffs have established a prima facie Title VIII case under § 3604(a) against PHA and RDA by proving that the agencies' acts had a discriminatory effect and that the agencies have failed to justify the discriminatory results of their actions.
 
 
 101
 Until relatively recently, federal courts were not often called upon to adjudicate Title VIII claims. We attribute this circumstance to our impression that, at least with respect to alleged discrimination in housing by governmental agencies, the inquiry into claimed equal protection violations has made unnecessary a separate consideration of the "coextensive" rights and remedies afforded by Title VIII. However, given the increased burden of proof which Washington v. Davis and Arlington Heights now place upon equal protection claimants, we suspect that Title VIII will undoubtedly appear as a more attractive route to nondiscriminatory housing, as litigants become increasingly aware that Title VIII rights may be enforced even without direct evidence of discriminatory intent. We conclude that, in Title VIII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response.
 
 
 102
 Here, the relevant provision of Title VIII is 42 U.S.C. § 3604(a), which provides that "it shall be unlawful . . . (t)o . . . make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin." Section 3604 is among those sections of Title VIII that are enforceable by private parties, see 42 U.S.C. § 3612. Indeed, in Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), the Supreme Court noted that "complaints by private persons are the primary method of obtaining compliance with (Title VIII)." Id. at 209, 93 S.Ct. at 366. This statement, while endorsing the viability of Title VIII claims by private plaintiffs, does not indicate the elements of such a claim.
 
 
 103
 Looking to § 3604(a) itself, we note that the "because of race" language might seem to suggest that a plaintiff must show some measure of discriminatory intent. To so construe § 3604(a), however, would have the effect of increasing the plaintiffs' burden in proving a prima facie Title VIII case to a level almost commensurate with the burden of proof required to demonstrate an equal protection violation. We would be most reluctant to sustain such a requirement.
 
 
 104
 First, we find significant the fact that in Arlington Heights, the Supreme Court, after applying the Washington v. Davis "impact-plus" equal protection test to plaintiffs' claims, remanded the case to the Seventh Circuit for consideration of plaintiffs' Title VIII claims. In Arlington Heights the lower courts had concluded that only discriminatory effect had been proved. If the same "impact-plus" test governed Title VIII actions, consideration on remand of the § 3604(a) claim would have been unnecessary and a waste of valuable judicial resources, factors which could not have been lost upon the Supreme Court. In remanding, rather than directing the dismissal of the Arlington Heights litigation, the Court at least implied that considerations other than those necessary for proof of equal protection violations must govern Title VIII claims.
 
 
 105
 On remand in Arlington Heights, the Seventh Circuit has adopted this interpretation of the Supreme Court's action. Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d 1283, (7th Cir. 1977) (Arlington Heights II ). The Seventh Circuit has persuasively put to rest the assumption that the "because of race" language in § 3604(a) requires proof of Washington v. Davis intent in Title VIII cases. As Arlington Heights II points out, the "because of race" language is not unique to § 3604(a): that same language appears in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(h), yet a prima facie case of Title VII liability is made out when a showing of discriminatory effect (as distinct from intent) is established. That the discriminatory effect standard still applies for Title VII cases is demonstrated by Mr. Justice Rehnquist's promulgation of the "impact-plus" equal protection standard in Washington v. Davis. Justice Rehnquist identified the error in the lower court's analysis of the constitutional claim in Washington v. Davis by noting that the test applied would be proper for a Title VII case but was insufficient to make out a constitutional violation. See 426 U.S. at 246-48, 96 S.Ct. 2040. As mentioned above, the Supreme Court's treatment of Title VIII in Arlington Heights is consistent with that Court's adoption of the separate and distinct standards to be employed in adjudicating Title VII claims as contrasted with constitutional claims.
 
 
 106
 Although the legislative history of Title VIII is somewhat sketchy,[29] the stated congressional purpose demands a generous construction of Title VIII. The Supreme Court has noted the need to construe both Title VII and Title VIII broadly so as to end discrimination. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (Title VII); Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (Title VIII). During the long floor debate prior to passage of Title VIII in the Senate, several Congressmen spoke of the importance of Title VIII in eliminating the adverse discriminatory effects of past and present prejudice in housing.[30] Significantly, as the district court noted, while the floor debate continued, Senator Baker introduced an amendment that would have required proof of discriminatory intent to succeed in establishing a Title VIII claim. Adoption of this amendment would by definition have burdened Title VIII with a standard similar to the present "impact-plus" equal protection standard of Washington v. Davis. Senator Baker's amendment was rejected, 114 Cong.Record 5221-22 (1968), with Senator Percy maintaining that if "racial preference" was to be an element of the new legislation, "proof would be impossible to produce." Id. at 5216, quoted at 425 F.Supp. at 1022.
 
 
 107
 In light of these considerations, we are convinced that a Title VIII claim must rest, in the first instance, upon a showing that the challenged action by defendant had a racially discriminatory effect.[31]
 
 
 108
 Having determined that discriminatory effect alone will, if proved, establish a Title VIII prima facie case, we must determine under what circumstances a Title VIII defendant can justify the discriminatory effect which results from its challenged action.[32] We agree that the test for Title VIII liability, like that of Title VII, "involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is appropriate under the Constitution where special racial impact, without discriminatory purpose, is claimed." Washington v. Davis, supra, 426 U.S. at 247, 96 S.Ct. at 2051. The district court, adopting the approach taken by the Eighth Circuit in United States v. Village of Black Jack,[33] held that once the plaintiffs' prima facie Title VIII case had been made out, presumably under § 3608(d)(5), the burden shifted to the defendant to justify its actions by proving a "compelling" interest. We believe that in placing this burden upon Title VIII defendants, the district court erred, and this without regard to the particular provision of Title VIII which was violated. "Compelling interest" analysis is not a part of Title VII doctrine, and we conclude that this heavy burden should be reserved not for Title VIII defendants, but for those who seek to justify denials of equal protection by purposeful discrimination. See Washington v. Davis, supra; Arlington Heights, supra.
 
 
 109
 Looking to Title VII for the correct standard for rebuttal of a prima facie case, we note that the "business necessity" test employed in Title VII job discrimination cases, Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), is of somewhat uncertain application in Title VIII cases. An employment practice producing a discriminatory effect under Title VII might well be justified by the fact that it is "substantially related to job performance."[34] However, it appears to us that the job-related qualities which might legitimately bar a Title VII-protected employee from employment will be much more susceptible to definition and quantification than any attempted justification of discriminatory housing practices under Title VIII. As one commentator has observed, "the consequences of an error in admitting a tenant do not seem nearly as severe as, for example, the consequences of an error in hiring an unqualified airline pilot."[35]
 
 
 110
 For the present, Title VIII criteria must emerge, then, on a case-by-case basis. The discretion of the district court in determining whether the defendant has carried its burden of establishing justification for acts resulting in discriminatory effects may be guided at the least by the following rough measures:[36] a justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact.[37]
 
 
 111
 If the Title VIII prima facie case is not rebutted, a violation is proved. The question of remedy then remains. We note that the federal courts must stand prepared to provide "such remedies as are necessary to make effective the congressional purpose." J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). However, we are also mindful of the recent Supreme Court admonitions in equal protection cases that federal equitable relief must be carefully tailored to be no more intrusive than is necessary to remedy proved constitutional violations. See part IIIB at pp. 144-145, supra. That admonition is no less forceful where statutory rather than constitutional rights must be vindicated. Thus, just as we must be careful to structure and limit equitable relief in cases involving violation of constitutional rights, so too must we be similarly cautious in the light of this record in tailoring the remedy here to that which is necessary to correct the statutory violation found.
 
 2.
 
 112
 As our recitation of the facts found by the district court reveals, the actions of PHA and RDA in connection with urban renewal activities in Whitman have had a racially discriminatory impact. See pp. 130-137 supra ; 425 F.Supp. at 1023 ("it is clear from this record that the actions of . . . RDA and PHA in terminating the Whitman Park Townhouse Project, taken against the background of racial segregation in Philadelphia and in the PHA system, had a disparate racial effect"). This conclusion is not surprising in light of the shift in racial composition in the project area which we described in some detail in the initial part of this opinion. Whereas originally almost 45% of the families living in the Whitman project area were black, by the time urban renewal clearance was completed and the surrounding blocks reconstructed, virtually no black families were to be found in the area. The evidence produced by the plaintiffs, which revealed that the urban renewal activities of the defendants had the result of removing black families from the Whitman site, leaving Whitman as an all-white community, was sufficient to establish a prima facie case of discriminatory effect. Nor can there be any doubt that the impact of the governmental defendants' termination of the project was felt primarily by blacks, who make up a substantial proportion of those who would be eligible to reside there.
 
 
 113
 The mere showing of a racially discriminatory effect does not, however, necessarily constitute a violation of § 3604(a). See Arlington Heights II at 1290. However, here no justification has been forthcoming from PHA or RDA[38] to meet, let alone overcome, the plaintiffs' prima facie case. As the district court noted, the only justification advanced by any party for the action taken by the defendants was that of the City, but, as we have observed, the threat of violence cannot justify a deprivation of civil rights. Given the absence of any justification for PHA's and RDA's actions, we obviously do not find it necessary to assess the legitimacy of their interests as against the discriminatory effect which their actions caused. Similarly, defendants' failure to offer proof of justification renders fruitless consideration of any other factors under any standard which would implicate the discretion of the court in determining whether plaintiffs' prima facie case had been overcome.
 
 
 114
 In sum, therefore, it is apparent that by their actions PHA and RDA were responsible for making unavailable or denying housing, within the mean of § 3604(a), to black families who otherwise would be living in Whitman. This discriminatory effect has not been justified under any standard, and the record bears out the need for, and propriety of, the relief granted by the district court with respect to the Whitman Project.
 
 
 115
 We need comment only briefly on the form of the relief afforded by the district court in this respect. The district court was modest and conservative in the manner in which it corrected the statutory violation. Having no desire to become Philadelphia's "housing czar," see 425 F.Supp. at 1026, the district court required only that the construction of the Whitman project proceed as planned without further interference. In so providing, the district court did not venture outside the permissible boundaries of constitutional and statutory precepts.
 
 
 116
 We will affirm PP (1), (2) and (4) of the district court's order as they pertain to these defendants. Paragraph (3) of the district court's order will be discussed separately in Part V of this opinion.[39]
 
 IV.
 
 117
 WAIC's primary argument is that its members have been denied equal protection of the laws in that (1) they will be ineligible for ownership of project homes if and when the project is built, and (2) they have expended monies for their present housing without the benefit of any governmental largess. WAIC also argues (3) that the plaintiffs do not have standing; (4) that there has been no compliance with citizen participation requirements; and (5) that no Environmental Impact Statement had been filed respecting the project. The district court found no merit to WAIC's first four arguments, nor do we.
 
 
 118
 The plaintiffs, in response to the National Environmental Policy Act (NEPA) argument, point out that WAIC at no time before the district court raised or presented proof on this issue. The plaintiffs note that:
 
 
 119
 In the numerous pleadings, motions, and memoranda of law filed in this action WAIC has never raised issues regarding NEPA except for one paragraph in their answer to plaintiffs' corrected, second amended supplemental complaint. Docket entry 112. In that instance it was raised as a "defense" to plaintiffs' claim. No affirmative claim or relief was sought against any party, only that "no environmental impact statement has been filed with regard to the project herein involved by RDA, PHA, and/or HUD . . . ."
 
 
 120
 Brief for Plaintiffs at 164 n.146. Under these circumstances, and considering the record, we will not now entertain this issue on appeal. See Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d Cir. 1976) (per Mr. Justice Clark); Sachanko v. Gill, 388 F.2d 859, 861 (3d Cir. 1968).
 
 
 121
 Despite the rejection of WAIC's appellate contentions however, we are concerned with that portion of the district court's Order of November 5, 1976, which can be read as pertaining to WAIC as well as to the governmental defendants. We find it necessary, therefore, to address briefly the scope of the district court's Order as it may affect WAIC even though WAIC has not taken direct issue with this aspect of the district court's Order.
 
 
 122
 As previously mentioned, the district court's November 5th Order provided: (1) that the governmental defendants take all necessary steps to construct the project; (2) that PHA submit a racial composition plan for the project; (3) that PHA present a tenanting plan for all public housing projects; and (4) that "all parties to this litigation are enjoined from taking any action which will interfere in any manner with the construction of the Whitman Park Townhouse Project."
 
 
 123
 It is immediately evident that the first three directives impose no duties on WAIC and require no action by WAIC. However, the fourth segment of the order refers generally to "all parties to this litigation" and enjoins any action which will interfere in any manner with the project construction. WAIC, as previously noted, was permitted status in this proceeding as a defendant-intervenor. As such, WAIC must be considered bound by this provision of the district court's order.
 
 
 124
 We have serious doubts as to whether the district court even considered WAIC when it framed this portion of its order. As our discussion and a reading of the district court's opinion reveals, the district court was careful to specify those findings and grounds on which it predicated the liability of the governmental defendants. With respect to WAIC, however, the district court's opinion reveals only an equal protection discussion leading to the conclusion that "the evidence does not support a finding that the opposition to the Whitman Townhouse project by WAIC was substantially racial." 425 F.Supp. at 1024. Where the other defendants were found to have contributed to a racially discriminatory effect, the district court opinion is silent at to WAIC. See id. at 1021-25. In the absence of findings that WAIC has committed either statutory or constitutional violations, we are hard-pressed to find any basis for the imposition of an injunction against WAIC. Cf. Evans v. Buchanan, 555 F.2d 373, 389 (3d Cir. 1977) (Garth, J., dissenting) (before grant of injunctive relief can be affirmed, constitutional violations must be identified).
 
 
 125
 We recognize that WAIC has not specifically attacked this portion, part (4) of the court's order, in its brief.[40] Nevertheless, there can be little question but that the "remedy" afforded to the plaintiffs by the district court runs against WAIC. Nor can there be any question but that WAIC has vigorously opposed the construction of the project. In addition, the breadth and sweep of part (4) of the court's Order[41] as it might affect WAIC's legitimate, constitutionally protected activities has many troubling implications.
 
 
 126
 While in normal course we might hesitate to fragment an otherwise integrated Order of the district court without first remanding for findings which may have been inadvertently omitted, as well as for the district court's assessment of its injunction against WAIC, we are confident here that by removing WAIC from the operation of the injunction imposed by part (4) of the Order, we will do no violence to the overall remedy prescribed. First, recognizing that the injunction runs against the governmental defendants, we are certain that their respect for, and their obedience to, the mandate of the injunction will permit the court's objective construction of the Whitman Townhouse project to be fulfilled. Second, the fact the district court still retains jurisdiction over aspects of this proceeding (see note 15 supra ) assures that, any modification of, or additions or corrections to, its Order that may be required in the future, can be readily obtained. Third, and most important, there has been no finding or indication that WAIC would act in such a manner as to interfere illegally with the project.41a We are certain that, in the unlikely event that WAIC did improperly interfere with the project, the City of Philadelphia, in discharging its obligations under the district court's order, would take those steps necessary to implement the Order and to permit construction to continue.
 
 
 127
 Having concluded that, on this record, so much of the injunction as it pertains to WAIC cannot be sustained, P (4) of the Order, to the extent that it refers to other than the governmental defendants, will be vacated.
 
 V.
 
 128
 Paragraph (3) of the district court's November 5th Order provides that:
 
 
 129
 PHA shall present to this Court within ninety days a plan concerning the tenanting of all public housing projects within the City of Philadelphia which will further racial integration.
 
 
 130
 425 F.Supp. at 1029. The plaintiffs' complaint, however, does not involve other than the Whitman project. The plaintiff class certified, for example, included only those "who would be eligible to reside in the Whitman Park Townhouse Project." 425 F.Supp. at 993. Plaintiffs' original complaint, and their amended, corrected and supplemental complaints, seek no more than remedies limited to the Whitman project. The pleadings and evidence leave little doubt but that the plaintiffs and the defendants joined issue only with respect to the discrete Whitman project.
 
 
 131
 While we recognize that the district court admitted evidence concerning other areas of Philadelphia and their characteristics, that evidence was intended to serve not as a basis for restructuring PHA's overall practices but rather as a predicate for the parties' contentions respecting Whitman. At one point, even the plaintiffs acknowledged that they did not seek systemwide relief from PHA, but were concerned only with the failure of the governmental defendants in providing for the Whitman project's construction. See, e.g., N.T. 31-84. It is understandable, therefore, that while evidence extrinsic to Whitman was permitted, it was only the Whitman project on which the dispute focused.
 
 
 132
 The record, therefore, while it supports relief with respect to Whitman, does not support nor have the plaintiffs sought[42] the injunctive order directing PHA to present a tenanting plan furthering racial integration for all public housing projects in Philadelphia.[43]
 
 VI.
 
 133
 Having concluded that the district court did not err in its constitutional findings and its injunctive orders with respect to the City of Philadelphia, and that a statutory basis exists in 42 U.S.C. § 3604(a) to support the district court's injunction with respect to PHA and RDA,[44] we will affirm PP (1) and (2) of the district court's Order of November 5, 1976, which mandate the construction of the Whitman Park Townhouse project and which require PHA to submit a racial composition plan. Paragraph (3) of the district court's Order, which concerns public housing projects other than the Whitman project, will be vacated for the reasons expressed in Part V of this opinion. For the reasons set forth in Part IV of this opinion, the district court's injunction against WAIC in P (4) of its order will be vacated. Paragraph (4) of the district court's Order of November 5, 1976 will accordingly be modified to read:
 
 
 134
 (4) The defendants Philadelphia Housing Authority, Redevelopment Authority for the City of Philadelphia, City of Philadelphia, Department of Housing and Urban Development, their officers, agents, and employees are enjoined from taking any action which will interfere in any manner with the construction of the Whitman Park Townhouse Project.
 
 
 135
 Thus modified, P (4) will also be affirmed.
 
 
 
 *
 The Honorable Tom C. Clark, Associate Justice, Supreme Court of the United States (Retired), sitting by designation, heard the oral argument and participated in the decision in this case but died before the opinion was written
 
 
 [1]
 The Whitman Area Improvement Council, its officers and members ("WAIC") were permitted to intervene as defendants by a district court order dated July 6, 1971. App. at 1A
 In addition to the named parties, briefs of the following amici curiae were filed:
 United States, Housing Association of Delaware Valley and Fellowship Commission, Pennsylvania Human Relations Commission, and the National Commission Against Discrimination in Housing, Inc.
 
 
 [2]
 See PAAC v. Rizzo, 502 F.2d 306, 308 n. 1 (3d Cir. 1974), cert. denied, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975); cf. California Bankers Ass'n v. Shultz, 416 U.S. 21, 71, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (appellees who obtained relief in District Court "are free to urge in (the Supreme) Court reasons for affirming the judgment of the District Court which may not have been relied upon by the District Court")
 
 
 [3]
 The site is an area "bounded by Porter Street to the north, Oregon Avenue to the south, Front Street to the east, and midway between Second Street and Hancock on the west." 425 F.Supp. at 1009
 
 
 [4]
 On December 6, 1957, HUD agreed to an "annual contributions contract" for the project in the amount of $8,607,793
 
 
 [5]
 To a certain extent this decrease in the number of black families living in the Whitman project area was offset by a slight increase in the number of black households living in the blocks adjacent to the project site
 
 
 [6]
 Testimony at trial revealed that the population of southeastern Whitman has remained all white. See N.T. 31-148 to 149
 
 
 [7]
 HUD later re-approved the project under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which incorporated a "balancing" concept to HUD's site-approval procedures. "Balancing" permitted the approval of a project that would not advance racial integration if that project was paired with another that would produce a measure of integration. Here, the Whitman project, which would foster integration, was to be paired with the "Morton Addition", a project to be located in an all-black area. The approval of the Morton Addition was contingent upon the building of the Whitman project. Despite the failure to construct the Whitman project, the Morton Addition has nevertheless long since been completed and occupied. See 425 F.Supp. at 997 & n. 15
 
 
 [8]
 The district court described the Turnkey III program for the Whitman project as follows:
 Originally, of course, PHA would own and operate the Whitman Park Townhouse Project. The common areas which PHA would retain control of after the homes were purchased by public housing tenants were kept to a minimum. (N.T. 5-48). Tenants would take on maintenance responsibilities to build up "sweat equity" to enable them to make a down payment and eventually to own their homes.
 
 
 [425]
 F.Supp. at 997 n. 18. For other descriptions of HUD's Turnkey III program, see Catz, Historical and Political Background of Federal Public Housing Programs, 50 N.D.L.Rev. 25, 37-40 (1973)
 
 
 [9]
 The letter also refers to a change in the design which WAIC had suggested and which the district court opinion reveals was adopted by Multicon and PHA. See 425 F.Supp. at 997
 
 
 [10]
 As the district court determined, "City Managing Director Corleto stated that Multicon would not receive police assistance." 425 F.Supp. at 998
 
 
 [11]
 Multicon v. WAIC, No. 4515 (March Term 1971, C.P. Phila.), cited at 425 F.Supp. at 999
 
 
 [12]
 Mayor Rizzo testified at trial that
 I had a strong feeling when I ran for election, it was crystal clear, that I would preserve the neighborhoods of the City at any expense.
 
 
 [425]
 F.Supp. at 1001, quoting N.T. 42-82
 
 
 [13]
 Mayor Rizzo's campaign activities in support of WAIC and his rationale for taking that position are described in the district court opinion, 425 F.Supp. at 1001
 
 
 [14]
 Testimony before the district court revealed the following:
 After Mayor Rizzo's election in November of 1971, he had several meetings with James Greenlee, who was at that time both general counsel for RDA and Chairman of PHA. In November of 1971, Mr. Greenlee, as general counsel for RDA, gave a legal opinion to RDA, which was subsequently forwarded to HUD on November 23, 1971, that all required procedures had been followed in the planning and development of the Whitman Park Townhouse Project, and that no further public hearings were necessary. (N.T. 9-99, 14-18). 23 After Mayor Rizzo was elected Mayor in November, 1971, but before he took office in January, 1972, Mr. Greenlee, as Chairman of PHA, met with Mayor Rizzo to discuss the housing program in the City of Philadelphia. (N.T. 14-23 to 14-25). Mr. Greenlee testified that the Mayor's support was necessary to develop any type of housing program in order to assure passage of the necessary ordinances before City Council. (N.T. 14-26). After discussion of the proposed public housing plans, Mayor Rizzo expressed disfavor as to the sites proposed. (N.T. 14-47). Mayor Rizzo stated that he considered public housing to be the same as Black housing in that most tenants of public housing are Black. (N.T. 14-47). Mayor Rizzo therefore felt that there should not be any public housing placed in White neighborhoods because people in White neighborhoods did not want Black people moving in with them. (N.T. 14-47). Furthermore, Mayor Rizzo stated that he did not intend to allow PHA to ruin nice neighborhoods. (N.T. 14-47, 14-48). . . .
 
 
 [425]
 F.Supp. at 1001-02 (footnote omitted)
 
 
 [15]
 The district court's opinion reveals, for example, that the issue of attorneys' fees remains open. 425 F.Supp. at 1028-29. In addition, the court's order anticipates the submission and review of integration plans for both the Whitman Townhouse project, Order of November 5, 1976, P (2), and all public housing in Philadelphia, id. P (3). Thus the Order of November 5, 1976, lacks the requisite finality for appellate review under 28 U.S.C. § 1291
 
 
 [16]
 Arlington Heights, supra, 429 U.S. at 261, 97 S.Ct. at 561, quoting Warth v. Seldin, supra, 422 U.S. at 498-99, 95 S.Ct. 2197, and Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)
 
 
 [17]
 Having concluded that both RAB and two individuals who testified at trial (Ms. Thomas and Ms. Reynolds) have standing to raise the constitutional claims alleged here, we need not consider the effect of Ms. Thomas's attempted withdrawal of her testimony. See 425 F.Supp. at 1011. Suffice it to say that there were parties with standing at all times before the district court; that the court did not abuse its discretion in certifying the plaintiff class; and that the interests of the certified class were well-served by the vigorous advocacy of plaintiffs' counsel. We conclude that no prejudice inured to any party as a result of Ms. Thomas's testimony and application to withdraw that testimony. The "case or controversy" requirement of Article III has been met
 While the discussion has focused upon the plaintiffs' standing to raise their constitutional claims, our resolution of the standing question in this context also resolves any question of "Title VIII" standing (under 42 U.S.C. §§ 3601 et seq.). Here, as in Arlington Heights, the gravamen of the specific Title VIII grievance failure to construct a housing project is the same as that underlying the constitutional claim. Given that plaintiffs have standing to raise the constitutional claim, they cannot be said to lack standing to assert the same claim under Title VIII. For, as the Supreme Court noted in Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), Title VIII standing is as broad as Article III permits. Cf. Village of Arlington Heights v. Metropolitan Housing Development Corp., supra (Court found "constitutional" standing; remanded for consideration of Title VIII claims).
 
 
 [18]
 We previously discussed the nature and scope of the affirmative duty placed upon HUD by § 3608(d)(5) in Shannon v. HUD, 436 F.2d 809, 816 (3d Cir. 1970). As discussed below, our disposition of the instant appeal does not require us to address the question or to determine whether the judicially enforceable "affirmative" duty imposed upon HUD by § 3608(d)(5) can be imposed inferentially upon local housing authorities as well. Compare Acevedo v. Nassau County, 500 F.2d 1078, 1082 (2d Cir. 1974) (§ 3608(d)(5)'s affirmative duty to promote integration imposed upon HUD alone) with Otero v. New York City Housing Auth., 484 F.2d 1122, 1133-34 (2d Cir. 1973) (§ 3608(d) (5) imposed duty "to act affirmatively to achieve integration in housing" on Secretary of HUD and "through him on other agencies administering federally-assisted housing programs")
 
 
 [19]
 425 F.Supp. at 1018
 
 
 [20]
 Id. at 1023
 
 
 [21]
 In light of our disposition, we do not address the question of the applicability of affirmative duties imposed by 42 U.S.C. § 3608(d)(5) upon a municipality (here, the City of Philadelphia), see note 18 supra, nor do we find it necessary to determine precisely which provision of Title VIII the City violated. But see section B, infra
 
 
 [22]
 Arlington Heights also suggests reference to a sixth evidentiary source, legislative or administrative history, but that factor is not applicable here
 
 
 [23]
 The Court in Washington v. Davis did observe that
 It is also not infrequently true that the discriminatory impact . . . may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds.
 426 U.S. at 242, 96 S.Ct. at 2049, Mr. Justice Stevens, concurring in Washington v. Davis, suggested that under certain circumstances (e. g., where the "disproportionate impact" is "dramatic"), the inquiry into discriminatory purpose may well be subsumed by the inquiry into, and the finding, of discriminatory effect. See, e. g., Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 54 L.Ed.2d 498 (1977) (disparate impact in Texas's "keyman" system of selecting grand jurors held sufficient proof of discriminatory intent). See also Dayton Board of Education v. Brinkman, --- U.S. ----, ----, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (Stevens, J., concurring).
 Nonetheless, for most cases the Court's admonition in Washington v. Davis must be heeded:
 Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.
 426 U.S. at 242, 96 S.Ct. at 2049. Once such a "disproportionate impact" is shown, the normal course will be to search out other facts which, in conjunction with that impact, will demonstrate an "invidious discriminatory purpose" as well.
 
 
 [24]
 See 425 F.Supp. at 1024
 
 
 [25]
 Quoting Hills v. Gautreaux, 425 U.S. 284, 293-94, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), quoting Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 16, 91 S.Ct. 1267. See also Milliken v. Bradley, 418 U.S. 717, 744, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974)
 
 
 [26]
 See p. 139 supra
 
 
 [27]
 See notes 18 and 21 supra
 
 
 [28]
 We likewise need not consider alternative bases for affirming the district court's award of injunctive relief against PHA and RDA, e. g., a "taint" theory under which the City's unconstitutional conduct, together with the proven relationship and interaction between the agencies and the City, would so color the actions of PHA and RDA that relief against all three entities might be warranted; or that the governmental defendants violated duties imposed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which proscribes discriminatory exclusion from federally funded programs. See generally Lau v. Nichols, 414 U.S. 563, 566-69, 94 S.Ct. 786, 39 L.Ed.2d 1 (1976) (failure to provide English-language instruction to substantial number of Chinese-speaking students in San Francisco school system held actionable under Title VI)
 
 
 [29]
 Title VIII was adopted by Congress from Senator Mondale's floor amendment to the 1968 Civil Rights Act. Thus committee reports and other documents usually accompanying congressional enactments are missing here
 
 
 [30]
 E. g., 114 Cong.Rec. 228 (1968) (remarks of Senator Brooke); id. at 3421 (remarks of Senator Mondale)
 
 
 [31]
 In deciding that proof of discriminatory effect will establish a prima facie Title VIII case, we join the ranks of several other circuits. See Arlington Heights II, supra (Seventh Circuit); Smith v. Anchor Bldg. Corp., 536 F.2d 231, 233 (8th Cir. 1977) ("Effect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme"); United States v. City of Black Jack, 508 F.2d 1179, 1185 (8th Cir. 1974), cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). See also Kennedy Park Homes Assoc., Inc. v. City of Lackawanna, 436 F.2d 108, 114 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) (per Mr. Justice Clark) (applying discriminatory effect test to both constitutional and Title VIII claims); Comment, Applying the Title VII Prima Facie Case to Title VIII Litigation, 11 Harv.C.R.-C.L.L.Rev. 138-40, 150-63 (1976)
 
 
 [32]
 We read the Seventh Circuit's opinion in Arlington Heights II as requiring no more than we do in order for a plaintiff to establish a prima facie case, i. e., a plaintiff may establish a prima facie case by showing discriminatory effect without a showing of discriminatory intent. Arlington Heights II, 558 F.2d at 1290. To the extent that the Seventh Circuit would seem to go beyond this standard in its statement of "critical factors," id. at 1290, our impression is that the court is setting forth a standard upon which ultimate Title VIII relief may be predicated, rather than indicating the point at which the evidentiary burden of justifying a discriminatory effect will shift to the defendant
 Parenthetically, we note that the application of the Arlington Heights "critical factors" to the facts of the case before us would result in our sustaining the relief ultimately granted by the district court.
 
 
 [33]
 508 F.2d 1179 (8th Cir. 1974), cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)
 
 
 [34]
 E. g., Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972)
 
 
 [35]
 Comment, Prima Facie Case, note 31 supra, at 174
 
 
 [36]
 For other factors which may be relevant to the particular case, see Arlington Heights II, supra, at 1290; see also note 32 supra
 
 
 [37]
 If the defendant does introduce evidence that no such alternative course of action can be adopted, the burden will once again shift to the plaintiff to demonstrate that other practices are available
 
 
 [38]
 The City did advance one justification for its action, arguing that the threat of violence at the Whitman site in the event that construction resumed was sufficient reason to justify action on its part to halt construction of the project. The district court correctly rejected this purported justification, stating with authoritative support that "it is well established that a history of tension or violence does not excuse the violation of civil rights." 425 F.Supp. at 1019; see also id. at 1023-24
 
 
 [39]
 We have not overlooked the argument asserted by PHA that it had improperly been denied a constitutional right to trial by jury. PHA, claiming that Multicon, the developer, had breached the project contract, contends that the severance of its claim against Multicon, and a bench trial of the civil rights claims, denied to PHA its Seventh Amendment right to a jury trial by reason of the collateral estoppel effect of the district court's findings and judgment. We are not unmindful of the right which PHA might otherwise have to a jury determination, see, e. g. Lewis v. Hyland, 554 F.2d 93, 102-04 (3d Cir. 1977), but we are not persuaded that the essential elements of collateral estoppel have been met. See Donegal Steel Foundry Co. v. Accurate Products Co., 516 F.2d 583, 588 (3d Cir. 1975); Scooper Dooper, Inc. v. Kraftco Corp., 494 F.2d 840, 844 (3d Cir. 1974). Our review of the record would indicate that PHA's contract claims remain undecided and viable. Hence PHA's Seventh Amendment rights have consequently not been impaired. As Mr. Justice Clark, sitting by designation in the Seventh Circuit, wrote in Moore v. Townsend, 525 F.2d 482, 486 (7th Cir. 1975), a case also involving a Title VIII claim in analogous procedural circumstances:
 (Mrs. Melnick) insists that the filing of the crossclaims . . . against her . . . entitle(s) her to a jury on the Moores' claim.
 By severing the cross action, the court has preserved the right of Mrs. Melnick to a jury on the issues raised in that action. None of the questions involved in it are raised in the Moores' suit, and none have been determined. It will be soon enough to try Mrs. Townsend's claims for damages against her real estate agents after the liability of Mrs. Townsend is determined. We cannot permit such interstitial squabbles to delay and frustrate the Moores' claim. The Moores asked only for equitable relief, attorney's fees, and costs, and a jury is not available in such cases. Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).
 
 
 [40]
 Even in its post-trial motion, brought under F.R.Civ.P. 52(b), WAIC merely listed as its last assignment of error: "The court erred in its remedy."
 
 
 [41]
 See In re Penn Central Transportation Co., 560 F.2d 169, 178-79 (3d Cir. 1977) (vacating a portion of Reorganization Court Order No. 2569 as "too sweeping")
 41a As part of a compromise plan, PHA had offered to include Whitman residents in a screening committee to assure that those living in the project would be an asset to the community, 425 F.Supp. at 998. We do not preclude such a joint undertaking when applications for tenancy in the project are under review.
 
 
 [42]
 See Lewis v. Hyland, 554 F.2d 93, 102-04 (3d Cir. 1977) (award of damages vacated where case had been instituted and litigated over a six-year period as an action seeking equitable relief only)
 
 
 [43]
 In light of our disposition of the district court's award of systemwide relief against PHA, we need not consider the question whether such relief could be sustained under Title VIII
 
 
 [44]
 The injunction, of course, binds HUD as well. As noted, HUD has not appealed