[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action concerns an appeal by the plaintiff, Barberino Realty Development Corp. (hereinafter "Applicant"), from the decision of the defendant, Town Plan and Zoning Commission of the Town of Farmington (hereinafter "Commission"), denying its application for a zone change, approval of a site plan, and approval of an affordable housing project. The project consists of 267 units of housing to be constructed on 54.9 acres pursuant to General Statutes. Sec. 8-30g.
The Applicant had filed an affordable housing application on February 26, 2992 which the Commission denied. The Applicant filed a modified proposal which the Commission also denied. The Applicant then filed another modified proposal on March 24, 1993 which is the subject of this appeal. The application sought a zone change from the R-40 zone to the affordable housing zone ("AH Zone") pursuant to Article II, Sec. 25 of the Farmington Zoning Regulations. (ROR, Exhibit o, p. 62.) The Applicant stated that "[t]his application is submitted as an `affordable housing application' pursuant to Public Act 89-311, Section 8-30g. The Applicant will meet all of the requirements and comply with all of the restrictions imposed by the Act." (ROR, Exhibit a.) The Applicant proposed that 89 of the 267 units, or 33 1/3 percent, would contain a deed restriction and/or covenant to insure compliance pursuant to General Statutes, Sec. 8-30g(a)(1)(B). (ROR, Exhibit h-13.)
On April 26, 1993 the Commission held a public hearing. On June 7, 1993, the Commission denied the application. The Commission based its reasons for denial on criteria set forth in the Zoning Regulations, to wit: Article II, Sec. 25 concerning the affordable housing zone, and Article IV, Sec. 12 concerning standards for granting a change of zone. (ROR, Exhibit o, pp. 62-68; 91.) CT Page 9662
On June 18, 1993 the Applicant filed this appeal alleging that the Commission's action was arbitrary, capricious, unsupported by the record evidence, and an abuse of discretion, illegal and in violation of sec. 8-30g.
The Affordable Housing Land Use Appeals Act, codified in General Statutes, Sec. 8-30g, became effective in 1990. The Act modifies the procedure of judicial review of certain land use appeals to the Superior Court. The land use appeals affected are those in which the development proposed includes a certain percentage of affordable housing as defined by the Act. Once the appeal is taken, the burden of proof of traditional zoning practice, which rests on the appellant, no longer applies. Section 8-30g(c) provides as follows:
 Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.
The reasons for the Commission's decision must be supported by "sufficient evidence." The legislative history of the statute demonstrates that the legislature considered the evidentiary standard it set. In response to a colleague's question as to the meaning of sufficient evidence, and how it might relate to such standards as "fair preponderance of the evidence," "more probable than not," and "clear and convincing evidence," Representative Tulisano said, "[It is] enough evidence to reach a particular conclusion. It is in fact a new system we're developing here today. It is none of the three. . . . It is not a very high standard whatsoever . . . something has to be there and they will have sustained their burden. It is in fact a very easy thing to do." 32 H.R. Proc, Pt. 30, 1989 Sess., p. 10578-10579. Later during the debate, Representative Nickerson noted a change in the file copy, namely, CT Page 9663 the substitution of the word "sufficient" for the word "substantial" and asked what effect that change would make. The following exchange occurred:
 Representative Cibes: [A]s I believe Representative Tulisano explained well, it lowers the level which must be satisfied. . . .
 Representative Nickerson: That sufficient evidence would be a lower standard than substantial evidence, is that correct?
 Representative Cibes: [Y]es.
 Representative Nickerson: The determination as to what is sufficient if we adopt the amendment or substantial if we adopt the file as amended, though, would be in the hands of the Appeals Court, not in the municipal body making the initial decision, it that correct. . .?
 Representative Cibes: [T]hat is correct. . . . Id., p. 10618-10620
Immediately following the foregoing exchange, Representative Nickerson inquired as to the substitution of the word "substantial" for "vital" in the file copy where the bill describes the interest to be protected. Representative Cibes replied, "[T]he intention is to lower the burden of proof for the community, to lower the level of interest which is required." Id., 10620. Later he added, "[t]he intent here it to ratchet down the level of interest that is required for the commission to demonstrate that it is correct." Id., 10621.
An affordable housing development is defined as a "proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing as defined in section8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development. . . ." (General Statutes, Sec. 8-30g(1).)
Section 8-30g(a)(2) provides that "`an affordable housing application'" means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing. . . ." CT Page 9664
The Act permits an appeal by "[a]ny person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units. . . ." Sec. 8-30g(b). Standing involves a question of legal status. One must have some real interest in the cause of the action, or a legal or equitable right, title or interest in the subject matter of the controversy. Mobil Oil Corp. v. Zoning Board ofAppeals, 35 Conn. App. 204, 208 (1994); Investors Mortgage Co. v.Rodia, 31 Conn. App. 476, 479 (1993).
Section 8-30g(b) also states that "[e]xcept as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of . . . sections 8-8. . . ." Under traditional zoning appeals practice there must be an aggrieved party in order for the court to have jurisdiction to hear the appeal. The party claiming aggrievement must demonstrate a specific personal and legal interest in the subject matter of the decision as distinguished from a general interest, such as is the concern of all members of the community as a whole. In addition, the party must establish that this specific personal and legal interest has been specially and injuriously affected by the decision. Walls v. Planning Zoning Commission,176 Conn. 475, 478, 408 A.2d 252 (1979).
Steven Barberino, Jr., President of Barberino Realty 
Development Corp., testified that the corporation owned the subject property at the time of the application through the present. He submitted deeds evidencing ownership. The owner of the property which forms the subject matter of the application is always aggrieved. Bossert v. Norwalk, 157 Conn. 279, 285, 253 A.2d 39
(1968). Therefore, the Applicant has fulfilled the requirements of standing and aggrievement.
Before discussing the reasons advanced by the commission in its denial, it is well worth looking to the circumstances surrounding the enactment of section 8-30g. A "Blue Ribbon Commission on Housing," established by the then Governor William A. O'Neill and the General Assembly, proposed the affordable housing appeals procedure in its final report in 1989. The Commission was aware ofHuntington Branch NAACP v. Town of Huntington, 844 F.2d 926 (2d Cir. 1988), aff'd 488 U.S. 15, reh. den. 488 U.S. 1023 (1988). In that case, the court utilized a test which was adopted by the Third Circuit in Resident Advisory Board v. Rizzo, 564 F.2d 126 (3d CT Page 9665 Cir. 1977), cert. denied 435 U.S. 908 (1978). Both cases involved challenges by low income and minority persons whose housing needs were frustrated by local action. The balancing test which the commission must perform in subsection (c) of the Act is similar to the Huntington-Rizzo test, namely that the reasons for denial are bona fide and legitimate, and no less discriminatory alternative exists to serve those ends. The Huntington court also divided the second test into two parts, namely, those justifications which are "site specific" and those which are "plan specific." "Plan specific" problems can be resolved with less discriminatory design modifications, for instance, while "site specific" problems warrant review based on whether they are bona fide and legitimate. These tests, as Judge Berger pointed out in Wisniowski v. Berlin PlanningCommission, 10 Conn. L. Rptr. No. 9, 266 (December 13, 1993) correspond to sections 8-30g(c)(2), (c)(3) and (c)(4).
Given this framework, the court turns to a discussion of the reasons given by the commission for its denial of the application.
 1. Criteria: That the road network, to include intersections, impacted by the proposed development will be capable of satisfactorily handling the increased traffic generated by such use. (See ROR, Exhibit o, Article IV, sec. 12 B. 4.)
 The Commission unanimously finds that the traffic study submitted by F.A. Hesketh and Associates, Inc. indicates that the intersections of Morea Road/Meadow Road and Coppermine Road with Plainville Avenue are currently experiencing peak hour delays, with most traffic at the Morea Road/Meadow Road intersection waiting for two or more changes of the traffic signal during the heaviest traffic periods. Members further find that without the submission of a detailed plan to improve these intersections the additional traffic generated by 267 dwelling units would further worsen this substantiated congestion. Any future plan submitted should also include a design for acceleration and deceleration lanes at the proposed driveway locations with Plainville Avenue which fact was recognized by the applicant's traffic consultant.
(ROR, Exhibit j)
The proposed development of 267 units would be situated on the west side of Plainville Avenue, also known as Route 177, a two lane state-maintained highway which runs generally in a north-south direction. At the intersection approximately one-quarter mile south CT Page 9666 of the proposed entrance to Strawberry Cobble, Morea Road from the west joins Meadow Road from the east.
On April 26, 1993 F.A. Hesketh, the applicant's traffic planner and engineer, prepared a traffic study for submission by the applicant to the defendant commission (ROR Exhibit h-1, incorrectly dated April 26, 1992.) The sections of the road near the proposed site is level and the roadway geometry permits sight distance in excess of 800 feet in each direction. (Id., p. 2). Approximately 12,700 vehicles per day utilize the road in that area. Congestion occurs at the intersection of Meadow Road and Morea Road such that "most traffic on all approaches [waits] for two or more changes of the traffic signal light during the heaviest traffic periods." (Id., p. 8). The report bases its conclusions of the traffic impact of Strawberry Cobble on studies of the Institute of Transportation Engineers published in Spring 1991. The report predicts that a total of 2430 trips would be added to Route 177 in a twenty-four hour period. This prediction understandably raised safety concerns of the commissioners and area residents.
Hesketh proposed various ways to alleviate the congestion. He believed that his recommended improvements together with the improvements the State Traffic Commission (hereinafter, "STC") would require would accommodate the additional traffic within the local roadway system. (ROR, Exhibit h-1, p. 8-11.)
General Statutes, Section 14-298 provides that there shall be a state traffic commission within the department of transportation which, is the traffic authority charged with regulating traffic on highways under its jurisdiction. Section 14-311 provides that "[n]o person, firm [or] corporation . . . shall build any . . . development generating large volumes of traffic, having an exit or entrance on, or abutting or adjoining, any state highway or substantially affecting state highway traffic within this state until such person . . . has procured from the state traffic commission a certificate that the operation thereof will not imperil the safety of the public." Under the statutory scheme, the developer must seek such a certificate. The STC must consider highway safety, traffic density, character of the traffic, character of the highway and the findings of the local traffic control authority of the municipality. (Section 14-311(d).) Compliance is assured in that no building permit will issue until the municipal building official receives the certificate. (Section 14-311(b).) If the STC determines that the highway must be improved to handle the additional volume the developer is required to pay one hundred per cent of the costs of improvement. (Section 14-311(d).) CT Page 9667
The plaintiff argues that the commission cannot base its denial on the impact of the development on traffic because the municipality is pre-empted from regulating this interest. InManchester Sand Gravel Co. v. South Windsor, 203 Conn. 267,524 A.2d 621 (1987) the court held that a local ordinance prohibiting through truck traffic on certain roads was pre-empted by section14-298 which reserves regulation of through truck traffic to the STC.
The court has also held that where a zoning authority is acting in its legislative capacity on an application for a change of zone, it must deny the zone change where "a change of zone . . . is dependent for its proper functioning on action by other agencies and over which the zoning commission has no control. . . ." Jarvis Acres, Inc. v. ZoningCommission, 163 Conn. 41, 50, 301 A.2d 244 (1972). Where the commission is considering a site plan, however, it may not consider those offsite traffic problems which fall within the purview of the STC. Compounce Associates v. Southington Planning and ZoningCommission, Superior Court, Judicial District of Hartford-New Britain at New Britain No. 433603 (June 28, 1991, Holzberg, J.).
In its denial, the commission stated that the applicant should submit a more detailed plan to improve the intersections. It stated that the design should also include acceleration and deceleration lanes at the proposed driveway locations with Plainville Avenue. (Route 177.)
Hesketh proposed various ways to alleviate the congestion. He stated that he believed the STC would require "appropriate speed change lanes consisting of a left turn lane for through northbound traffic to have the ability to by-pass traffic which may be slowing or stopped to turn into Strawberry Cobble and a southbound speed change lane to accommodate right turning traffic entering the facility." (ROR Exh. h-1, p. 14.) He also suggested the use of stop signs, widened shoulders on both sides of Route 177 and the improvement of the existing turning lanes at the Meadow Road-Morea Road-Route 177 intersection. (Id., p. 15-16). He believed that his recommended improvements together with the improvements the STC would require would accommodate the additional traffic within the local roadway system. (Id., p. 8.)
The Commission argues that there was no evidence before the Commission that improvements would be made to the road network. It argues that the Applicant produced no evidence as to what the CT Page 9668 STC would do. The Commission was without legal authority to specify the changes to be made to the roadway, including curb cuts and driveways entering Route 177. (Fuller, Land Use Law andPractice, (1993) section 49.16, p. 816.) The Commission, however, could have conditioned its approval of the application upon the Applicant's obtaining a certificate of approval from the STC. General Statutes, Sec. 14-311 calls for Farmington's participation in the process of developing traffic flow improvements.
The Commission failed to meet its burden of proof that the public interest cannot be protected by reasonable changes to the proposed development. Accordingly, this reason is insufficient to sustain a denial.
 2. Criteria: That traffic circulation within the site and the amount, location and access to parking is adequate, and adequate sight distance is provided for all proposed and existing driveways. (See ROR, Exhibit o, Article IV, section 12.B. 3.)
 The Commission unanimously finds that a number of the proposed cartways were designed to serve an excessive amount of dwellings resulting in a safety hazard due to their narrow width and dead end nature.
(ROR Exhibit j)
At the public hearing on April 26, 1993, Robert Donald, of Donald Planning and Developing, Inc., the Applicant's planning expert, described the cartway system which provides access to several of the single-family units from the public street, Snowberry Way, and from the private streets within the development. As shown on the plans, (ROR, Exhibit 1, map 7 of 12) a private street is 22 feet wide and a cartway is 18 feet wide. Donald reviewed comments in a staff report entitled "Planning and Zoning Review" dated April 14, 1993. (This report was not made part of the Return of Record.) Donald agreed that "the cartway to the west of the multi-family" could be modified so that "the first four houses could be served by a private street, widening that area for the first four houses and the remaining four houses could be served by the cartway . . . and there is adequate space to do that without any problems" (There are actually nine houses having access to that cartway.) (ROR, Exhibit p, p. 13.) Commissioner Chaffee asked whether a "fire truck having gained access to the furthest (sic) house on a cartway would have to back out?" Donald agreed that it might and added, "[w]e discussed this CT Page 9669 with the Fire Marshall given the lengths of the cartways and the number of houses he does not see any problem. This is exactly the same system which was approved in Coppermine Village and it's been working for probably years." (Id, p. 17.) Under questioning from Commissioner Cowles, Donald stated that the plans showed that the cartway system to the west of the multi-family residential area served nine units, whereas other cartways served no more than six. He reiterated that the nine-unit cartway plan would be modified "to change the approach to a private street up to the last four units . . . and provide . . . a hammerhead turn." (Id.) He agreed that at Coppermine Village, an earlier development in Farmington, the largest numer [number] of units served by a cartway might be six, if not five.
There is no written document or verbal statement from the Fire Marshall in the record which controverts Donald's representations to the Commission. Aside from the nine-unit cartway, it is unclear what the Commission meant when it said ". . . the cartways were designed to serve an excessive amount of dwellings." (ROR, Exhibit j.) This reason implies that there is a number of dwellings the Commission believes could be safely served by a cartway. There is no evidence in the record to support the statement that the "narrow width and dead end nature" result in a safety hazard. While conceptually this might be the case, the court cannot draw that conclusion from the record evidence. No objection was voiced by a commissioner to Donald's statement that "exactly the same system . . . was approved in Coppermine Village and it's been working for probably years. . . ." (ROR, Exhibit p, p. 17.) The Commission failed to demonstrate that the public interest in safety could not be protected by reasonable changes to the development. It did not make a record to meet its burden of proof with regard to this reason for denial.
It is unclear from the record whether or not the commission considered the proposed modification suggested verbally by Donald with regard to the nine-unit cartway. The court, therefore, does not sustain this reason for denial. It directs, however, that the plan as to the nine-unit cartway be modified consistent with Donald's representation.
 3. Criteria: That the i) basic design of the proposed use(s) or buildings: (sic) ii) relationship between the buildings and the land; (sic) and iii) overall physical appearance of the proposed use(s) or buildings will be in general harmony with the character of the surrounding neighborhood and will not serve CT Page 9670 to blight or detract from abutting residence or other property. (See also ROR, Exhibit o, Article IV, section 12 B. 5)
 The Commission unanimously finds that the density, scope and size of the proposed development is incompatible with the surrounding R40 zoning district which has been uniformly developed at a density of one unit per acre. The design of the single family housing on very small lots, particularly along Plainville Avenue, is inappropriate with the area and is not in harmony with the adjacent Portage Crossing subdivision. Members further find that the multiple family housing proposed at three stories is inconsistent with the scale of the surrounding single family homes.
(ROR, Exhibit j.)
The Applicant applied for a zone change from the R40 zone to the AH (Affordable Housing) zone as designated in Article II, Sec. 25 of the Farmington Zoning Regulations. It is, in effect an overlay zone which permits the construction of affordable housing if certain criteria are met. Section 25 allows the submission of "an Affordable Housing Zone designation . . . for a parcel of land or part thereof located in any business, industrial or residential zone with the exception of the R80 Zone and which contains the minimum area set forth in this regulation." (ROR, Exhibit o, p. 62-63.)
The plaintiff filed his application for a change of zone with a site plan as required. Subsection E.1. of Section 25 states that "[a] parcel of land may be designated within the Affordable Housing Zone if its size is equal to or greater than four (4) acres." (Id., p. 63.) Permitted uses include single family dwellings and multiple family dwellings. (Id., p. 62.) All uses allowed by special permit in the R40 zone are allowed by special permit in the AH zone. In granting a special permit, however, "the Commission will be guided by standards provided in Article IV. Section 12." (Id., p. 62.) It is these standards which form the basis for the Commission's denial, including the third reason.
It is useful to compare the requirements of each zone. It is also useful to review the requirements for the R40 Cluster Subdivision Zone. This zone envisions a development of greater density than the instant one and gives an indication that the Commission has put into place a provision for more intensive development in the R40 zone. CT Page 9671
 R40: dwellings permitted one family unit minimum lot size 40,000 square feet maximum height 35 feet minimum floor area 1200 square feet minimum frontage 150 feet minimum front yard 50 feet minimum side yard 25 feet minimum rear yard 50 feet
 AH
dwellings permitted per acre 9 (33% of units are affordable housing) minimum lot size 4 acres maximum height 36 feet maximum length 160 feet minimum floor area per multiple family (rental) 600 square feet per multiple family (sale) 750 square feet per detached 2 family 1100 square feet bufferyard minimum frontage 40 feet bufferyard side yard 50 feet*
rear yard 50 feet*
R40 Cluster Subdivision
dwellings permitted 1 family minimum lot size 15,000 square feet maximum height 35 feet minimum floor area 1200 square feet minimum frontage 85 feet minimum front yard 30 feet minimum side yard 10% frontage (8.5') minimum rear yard 25 feet
(ROR, Exhibit o, Article III, section 6. p. 72.)
Snowberry Cobble
dwellings proposed 267: 108 rental 159 2 family density 4.9 units per acre minimum lot size proposed 5000 square feet CT Page 9672 maximum height proposed varies minimum floor area proposed 930 square feet minimum frontage proposed varies front yard proposed 20 feet side yard proposed 10% of width rear yard proposed 25 feet
(ROR, Exhibit c; Exhibit p.)
The requirements for the R40 Cluster Subdivision, as well as for the AH zone, indicate that the Commission had enacted regulations which envisioned a greater density in an R40 parcel. It is important to note that the Commission also envisioned circumstances in which it would reduce side and rear yard footage. The Commission, then, had already recognized that certain developments would be incompatible with their surroundings.
The incompatibility of a proposed affordable housing development is not, per se, a sufficient reason to deny an affordable housing application. A review of the legislative history demonstrates that the legislature foresaw the situation wherein a developer would propose greater density than a given zone permitted.
 Rep. Farr: [I]f the proposed plan called for a substantial change in the longstanding zoning in the area of the community, would that in itself be sufficient grounds for the denial? . . . Or to give you a better example, an area that's zoned single-family has got some vacant land and now the proposal is to put up multi-family, would that in itself be a basis for the denial?
 Rep. Cibes: [T]he answer is no, not per se. The municipality might have very good grounds for not having multifamily dwellings in the particular area. The soil type, the capacity of the infrastructure, various reasons such as that might have been a reason for the municipality not to adopt a particular zone for that particular area, but per se, there would not — it would not be a reason for rejecting this application.
32 H.R. Proc, Pt. 30, 1989 Sess., p. 10608.
Senator Blumenthal, however, said in the Senate debate, "it is important to understand that these decisions involve specific projects on particular pieces of land and do not provide for any kind CT Page 9673 of general zoning override." 32 Senate Procs., Part 3, June 5, 1989, at 4048.
While the legislature may have been unsure as to the extent to which local zoning regulations might be overridden, it was clear that in certain cases a specific zoning override would occur. Were that not the case little affordable housing would be built. The purpose of this legislation was to provide an opportunity for developers to construct affordable housing where the quid pro quo is the allowance of greater density by the local zoning authority for the opportunity for the locality to meet its legislatively mandated requirement to provide affordable housing.
In Pratt's Corner Partnership v. Southington Planning andZoning Commission, 9 Conn. L. Rptr. No. 10, 291, 292 (July 26, 1993) Judge Mottolese stated as follows:
 The General Statutes are replete with forceful legislative expressions of the long standing statewide need for affordable housing both as defined in sec. 8-39a and sec. 8-30g. In the area of land use, the legislature first broached the concept of affordable housing when in 1984 it obligated every zoning commission, by regulations, to "encourage the development of housing opportunity for all citizens of the municipality consistent with soil types, terrain and infrastructure capacity." P.A. 84-263. In 1988, the General Assembly passed P.A. 88-338 "An Act Promoting the Development of Affordable Housing Through the Use of Municipal Planning and Zoning Authority" which authorized zoning commissions to enact regulations permitting special exemptions from density limits to developers who agree to construct units of affordable housing. In 1991, the legislature amended sec. 8-2 to broaden the mandate for affordable housing to include the needs of residents of the planning region in which the municipality is located and to promote choice and economic diversity in housing for low and moderate income households. P.A. 91-392. This amendment not only applied to the legislative power of a land use authority but also to the planning power so that the municipal plan of development was thus required to reflect the mandate.
Enacting section 8-30g is perhaps the boldest step the legislature has taken in this area. It placed the burden on the Commission to prove, based on substantial evidence in the record, that the harmony and compatibility of an area is necessary to CT Page 9674 protect substantial public interests in health and safety or other matters which the commission may legally consider and that such public interests clearly outweigh the need for affordable housing; and further that such public interests cannot be protected by reasonable changes to the proposal.
Many area residents spoke against the proposal on the basis of its incompatibility with its surroundings. There was, however, no evidence that this incompatibility had an adverse effect on substantial public interests in health or safety. The Commission did not meet its burden in connection with its third reason for denial, and, therefore, its denial cannot be sustained.
 4. Criteria: The Commission may withhold approval of an Affordable Housing Zone if it determines that the infrastructure proposed to serve the development (including but not limited to schools, utilities and roadways) cannot adequately support the number of housing units proposed. (See also Article II, section 25, E. 7.)
 The Commission unanimously finds that the school plant including the addition of an expanded Irving Robbins Middle School cannot accommodate the expected number of students generated from this proposed development. Members recognize that there are no current plans for further school building expansion.
(ROR, Exhibit j.)
Members of the public expressed concern regarding the impact of the affordable housing project on the Farmington school system. Donald, the Applicant's planning consultant, estimated an increase of 97 school children based on present experience in the Red Oak Hill development of 300 units. (ROR, Exhibit p, p. 50.) Townspeople challenged the wisdom of using a formula not prepared by the Farmington Board of Education or the Town of Farmington which, they contended, would provide a higher number as multiplier than that used by Donald. Donald defended the figures he used as "within the enrollment projections which were used by the Board of Education to convince the Town of Farmington to construct their current building program" (Id., p. 56.) In response to a speaker, a commissioner stated that it would obtain the Board's formula from the Board of Education.
There is no evidence that this formula was received by the CT Page 9675 Commission and considered by it in rendering its denial. The concerns expressed centered upon class size and sufficiency of school space. The regulations provide that the Commission must determine whether the infrastructure will support the proposed development. At the core of such concerns as class size, sufficiency of school space and infrastructure are fiscal considerations: whether the town will be able to provide equal or better education with an increased number of students without an increase in the Board of Education budget.
Neither sections 8-2 or 8-30g expressly or impliedly permit a rejection of an affordable housing application premised on the impact of additional students on the school system. TCR NewCanaan, Inc. v. Planning and Zoning Commission of Trumbull, 6 Conn. L. Rptr. No. 13, 372 (June 1, 1992), Pratt's Corner Partnership v.Southington Planning and Zoning Commission, supra, 295.) See alsoCapalbo v. Planning Zoning Board of Appeals, 208 Conn. 480,547 A.2d 528 (1988); Beach v. Planning Zoning Commission, 141 Conn. 79,103 A.2d 814 (1954.)
Although the Commission bears the burden of proof, it made no findings as to what the increased number of children would be, and how, for instance, that number would effect the number of school bus trips using Route 177 or create any dangers to the health, safety and welfare of the public. It failed to reveal publicly any special knowledge or experience as to the material facts that were critical to its decision so that Barberino could have an opportunity for rebuttal. Feinson v. Conservation Commission, 180 Conn. 421, 428,429 A.2d 910 (1980). What the record contains is Donald's assertion that his formula is within the bounds of the Board of Education enrollment projections. Therefore, the Commission's fourth reason for denial is not supported by sufficient evidence in the record and cannot be sustained.
The Commission advanced other reasons for denial:
 1. An affordable housing development of this size should be located in an area with proximity to mass transportation. The board found little likelihood that mass transit would be available in the foreseeable future along Plainville Avenue.
 2. The public interests in safety, traffic control and maintaining harmony with the surrounding neighborhood is not fulfilled by the proposed development and that the deficiencies in the public interests discussed above clearly outweigh the CT Page 9676 need for this affordable housing as proposed.
 3. This decision is necessary to assure a more integrated future community in this section of Town and that preserving the community character of an area is a delicate process which the applicant has failed to achieve in this instance.
 4. The proposed development requires substantial changes and modifications to meet the public interests and, if the applicant acts to remedy the deficiencies noted, the Commission, will, without prejudice, consider the revised proposal and take appropriate action.
(ROR, Exhibit j.)
The first of these reasons is not sufficient as the Commission made no showing that the residents of this particular development would require more public transportation that residents in a development that would completely meet the zoning requirements for this area. The assumption inherent in this proposal, by the provision of parking spaces, is that the residents will not be dependent upon public transportation. This matter is more properly one for Farmington and perhaps its regional neighbors and the State.
The second and third reasons have been discussed above in the context of the four criteria set forth in the reasons for denial.
The last reason for denial is perhaps the Commission's attempt to meet the statutory criteria of section 8-30g(4). It is unclear what the commission means by "substantial" changes, and whether these "substantial'["] changes would be considered "reasonable". Since this reason begs the question, the court finds that it, along with the preceding three, is insufficient to sustain the commission's denial of the application.
For the foregoing reasons, the decision of the commission is reversed with regard to reasons 1, 3 and 4 and reversed and modified as to reason 2.
Leheny, J.